**STATE of Minnesota, Respondent,**

v.

**Rodney Allen WARNDAHL, Appellant.**

No. C2-88-597.

Supreme Court of Minnesota.

March 10, 1989.

C. Paul Jones, State Public Defender, Cathryn Y. Middlebrook, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Asst. Atty. Gen., St.

Paul, and Michael Lynch, Kandiyohi County Atty., Willmar, for respondent.

YETKA, Justice.

On December 8, 1987, defendant, Rodney Allen Warndahl, after a bifurcated trial before the Kandiyohi County District Court, was convicted of first- and second-degree murder in connection with the August 29, 1987 death of Jacqueline Duncan. Defendant was sentenced to a mandatory life term.

On appeal, defendant does not dispute that he caused the death of Jacqueline Duncan, but argues that his conviction must be reversed because: 1) the trial court erred in failing to suppress defendant's statements made to police after he had requested an attorney and 2) the trial court erred when it ruled that he was not legally insane at the time he killed Jacqueline Duncan.

We affirm the conviction.

Defendant, 24 years old at the time of the offense, lived with his wife and children in an apartment in Willmar. The victim, Jacqueline Duncan, lived in the same building. Defendant described his relationship with Duncan as a casual acquaintance and claimed that, except for a few times when he had to ask her to turn down her television, he had had no problems with her and felt that she was a good neighbor.

Defendant's past criminal history consists of a 1977 juvenile court conviction for first-degree criminal sexual conduct. During the proceedings for this offense, defendant was diagnosed as a borderline psychotic individual and was subsequently placed in a boys' school and then several foster homes. He later served 7 years in the Navy, primarily as a cook in the submarine service. In 1987, defendant was transferred to Willmar to work as a Navy recruiter. While defendant had previously enjoyed being in the Navy, he found his job as a Navy recruiter extremely stressful because it entailed frequent contact with people. Defendant's wife testified that de-

fendant, who was already introverted, became much more withdrawn after they moved to Willmar.

On August 29, 1987, at approximately 2:08 a.m., Willmar police received a 911 call from defendant, who told the dispatcher, "I've got a problem. A murder." Defendant explained to the dispatcher that he didn't know what happened, but that he had gone crazy and had killed his neighbor with a knife.

When police arrived at defendant's apartment, he met them wearing only a pair of bikini underwear with a red stain on the front. Defendant told police that he didn't know or remember what happened, but when he woke up, his downstairs neighbor, Jackie, was dead and he had killed her. The police then proceeded to the downstairs apartment where they discovered the body of Jacqueline Duncan lying in the bathroom entryway. Medical Examiner Dr. Garry Peterson, who performed the autopsy on Duncan's body, testified that he found 45 different stab and cut wounds. Dr. Peterson concluded that the cause of death was exsanguination (bleeding to death) from one of three major wounds to her chest.

Police discovered physical evidence in Duncan's apartment which further implicated defendant. A large kitchen knife removed from Duncan's body was determined to have been from a set of kitchen knives found in defendant's apartment. Also, a bloody fingerprint and a bloody footprint found in Duncan's apartment were later identified as those of the defendant.

At approximately 4:05 a.m. the morning of the murder, Investigator Dennis Sigafoos of the Bureau of Criminal Apprehension (BCA) took a taped statement from defendant. Defendant told Sigafoos that, earlier that morning, he had gone to sleep on his couch after returning from a bar in Montevideo and when he awoke, he was in Duncan's shower. He said that he stepped out of the shower and saw Duncan lying on the floor with a knife in her side. He claimed that he then realized that he had killed her and called 911. Defendant re-

peatedly stated that he did not know what had happened to Duncan except that he must have killed her. This interrogation stopped at 5:05 a.m. to allow defendant to rest.

At about 11:00 a.m. on August 29, Sigafoos advised defendant of his rights and attempted to take another statement from him. At this time, defendant declined to talk and asked to speak with an attorney. Questioning then ceased.

On August 30, at approximately 1:30 p.m., Investigator Robert Roman, fully aware of defendant's earlier request to speak with an attorney, went to the Kandiyohi County Jail to speak with defendant. Roman read defendant his *Miranda* rights and asked him if he had any questions. Defendant asked a series of procedural questions and then, unprompted by Roman, stated that he was in real trouble and felt that he had killed Duncan, but could not remember anything about the incident. At this point, Roman interrupted defendant to tell him that he was starting to talk about the case and reminded him of his earlier request for an attorney. Roman then asked defendant if he understood his right to an attorney and if he was waiving this right. Defendant responded that he understood and was willing to speak with Roman.

At first, defendant repeated the same story he had given to police earlier. Defendant also told Roman about several things that had been bothering him the week of the murder. Defendant spoke of his dissatisfaction with his job as a Navy recruiter and his anxiety about having low recruitment totals. He was also upset that his wife had taken their children to the Twin Cities for the weekend.

Roman then asked defendant to try to recall the events of August 29. Defendant proceeded to give Roman a detailed account of the events, stating that, during the early morning of August 29, he had felt an overwhelming need to talk with somebody. Defendant knew that Jacqueline Duncan was home so he went down to her apartment and asked if she would like to come upstairs to watch a movie with him.

Duncan refused in a curt manner and slammed the door in his face. Defendant returned to his apartment, thought about Duncan's response in addition to his other problems and became very upset. He then took a large kitchen knife and went downstairs to Duncan's apartment again. In his statement, defendant claimed that he could not recall why he picked up the knife and that different thoughts were rushing through his head.

Defendant next entered Duncan's unlocked apartment without knocking, walked over to the couch where she was sitting and, without speaking, stabbed her three times in the chest. Defendant vaguely remembers dragging her body into the bathroom after she fell to the floor. Afterwards, defendant took a shower and, when he was finished, saw Duncan's 3–year–old son standing over her body.

When asked to describe his state of mind at the time of the killing, defendant responded that he was aware of being in the victim's apartment during the attack and knew what he was doing when he struck her with the knife. He added that, during the attack, he was engulfed by a rage which he did not understand, but repeated that he knew what he was doing when the attack occurred. Defendant was unable to provide a specific motive for his attack, but surmised that Duncan's slamming the door in his face, combined with his other problems, caused him to blow up.

At approximately 8:25 p.m. on August 30, the Kandiyohi County jailer informed Investigator Sigafoos that defendant wanted to speak with him. Sigafoos went to the jail and met with defendant. After reading him his *Miranda* rights, Sigafoos asked defendant if he had wanted to speak with Investigator Roman earlier that day. Defendant replied "yes" and explained that he had been making requests to the jailers to speak with an investigator.

Sigafoos then asked defendant what he recalled of the events of August 29. Defendant told Sigafoos that, after returning home from Montevideo at 12:45 a.m., he removed all his clothes except his underwear and put on a robe. He sat around his

apartment for awhile and then went downstairs to ask Duncan if she wanted to watch a movie with him. After she refused in an unpleasant and indifferent manner, he went back to his apartment and brooded. Defendant said that the next thing he knew he was walking down the stairway of his apartment building dressed only in his underwear and carrying a knife. He went to Duncan's apartment, opened the unlocked door and walked towards Duncan, who was sitting on a couch, and began stabbing her. As he stabbed her, she screamed and called out defendant's name several times.

Defendant did not recall how many times he stabbed Duncan, but remembered dragging her body into the bathroom. Defendant then stepped into the shower and claimed that, when the water hit him, he snapped out of his "mood or daze." He saw Duncan lying on the floor with a knife in her side and her young son standing by her body crying. When Sigafoos asked what had upset him enough to cause him to kill Duncan, defendant stated that he didn't know, but that he was frustrated with his Navy recruiting job.

In support of his mental illness defense at trial, defendant offered two expert witnesses and the juvenile court records of his 1977 sexual assault conviction. The state rebutted with one expert witness.

Defendant's first expert was Dr. William Fischer, a medical psychologist, who had examined defendant for 5 hours and had reviewed the juvenile court records, police records and defendant's letters to his wife. Based on his examination, which included an interview and a variety of objective tests, Dr. Fischer diagnosed defendant as suffering from paranoid schizophrenia.

Dr. Fischer believed that defendant's paranoid schizophrenia, combined with additional stresses in his life, caused defendant's entire self-control to break down and resulted in his psychosis erupting into a destructive process. During the actual killing, Dr. Fischer believed that defendant was having a blackout or "episode of syncope," which he defined as a loss of contact with reality. Dr. Fischer concluded that, at the time defendant killed Jacqueline Duncan, he was laboring under such a defect of reason as a result of his paranoid schizophrenia that he did not know what he was doing or that it was wrong. When asked to explain how defendant was later able to provide a detailed account of the homicide to police, Dr. Fischer explained that defendant did not actually remember what had happened, but had pieced together an account by listening to what police and other people had told him about the homicide.

Dr. James H. Gilbertson, a licensed consulting psychologist who had examined defendant in 1977 regarding his 1977 criminal sexual assault conviction, also testified for defendant. Dr. Gilbertson stated that, in 1977, defendant was suffering from a mental disorder, most likely paranoid schizophrenia. He believed that defendant had suffered a psychotic break during the commission of his 1977 criminal sexual assault and thus could not appreciate the nature of his act. His basis for this belief was defendant's inability to give a motive for his actions or to state whether he believed his actions were right or wrong.

In addition to the two experts, defendant also offered as evidence the juvenile court records of his 1977 conviction for first-degree criminal conduct. With a report from Dr. Gilbertson echoing his trial testimony, the records contain a report by Dr. Joe Finkelstein, Director of Adolescent Psychiatric Services for Fairview Hospital where defendant was admitted after the 1977 offense. In his report, Dr. Finkelstein agreed that defendant had a borderline psychotic thought disorder, but wrote that defendant did not appear to be grossly delusional or grossly psychotic. Dr. Finkelstein also wrote that it was obvious from defendant's ability to give a clearer description of the offense as time passed that he understood the nature of his act and that it was wrong. In addition, Dr. Finkelstein believed that defendant was competent to stand trial despite his borderline psychotic thought disorder.

In rebuttal to the defendant's experts, the state offered the testimony of Dr. R. Owen Nelson, an independent clinical psy-

chologist. Dr. Nelson conducted two interviews with defendant and reviewed the results of the tests administered by Dr. Fischer, a transcript of Dr. Fischer's testimony, police reports and the juvenile court records. Based on this information, Dr. Nelson believed that defendant suffered from a personality disorder of a mixed type. He did not believe that defendant was mentally ill in the sense that he suffered from a major thought disorder that impaired his thinking and reasoning severely. Dr. Nelson testified that he would not diagnose defendant as a paranoid schizophrenic because he could not detect any hallucinations, delusions or highly distracted thought processes which are completely out of touch with reality.

When asked whether defendant knew the nature of his act or that it was wrong, Dr. Nelson stated that he was unable to answer because defendant intentionally withheld information during both interviews, preventing completion of the examination. However, when Dr. Nelson was asked to consider what defendant had told police and Dr. Fischer about the homicide, he was able to state unequivocally that defendant understood enough about his actions to realize that they were wrong.

The issues raised by this appeal are:

I.  Did the trial court err when it failed to suppress defendant's August 30 statements to Investigators Roman and Sigafoos and if it did, was such error harmless?

II. Did the trial court err when it found that defendant was not legally insane at the time of homicide?

The trial court denied defendant's pretrial motion to suppress all of defendant's statements to police on the grounds that the statements were made voluntarily and not in response to any police questioning or made voluntarily after defendant was given *Miranda* warnings. On appeal, defendant contends that the trial court erred in failing to suppress his two August 30 statements to police. He argues that admission of his statement to Investigator Roman was improper because Roman had initiated the contact leading to it after a request for

counsel had been made. Defendant then argues that, because the statement to Roman was taken in violation of his constitutional rights, his second statement—to Sigafoos—was tainted and should also have been suppressed.

■ Once it has been proven that an accused has invoked the right to counsel, a court may admit responses to further questioning only by finding that the accused 1) initiated further discussions with police and 2) knowingly and intelligently waived the right invoked. *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488 (1984) (citing *Edwards v. Arizona*, 451 U.S. 477, 484–86, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981)).

■ There is no question that Roman initiated the contact which led to the first August 30 statement by defendant. Therefore, even though defendant willingly and knowingly waived his right to speak with an attorney, the statement taken by Roman should have been suppressed.

Defendant's August 30 statement to Investigator Sigafoos appears to meet both of the requirements for admissibility in *Smith*. Defendant does not dispute this, but, instead, argues that his statement to Sigafoos was a direct product of the exploitation of the unconstitutional statement taken by Roman and thus should have been suppressed under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. 2d 441 (1963).

In *Wong Sun*, the United States Supreme Court ruled:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*Wong Son,* 371 U.S. at 487–88, 83 S.Ct. at 417 (quoting Maguire, *Evidence of Guilt* 221 (1959)).

This court has looked at several factors to determine whether evidence is "fruit of the poisonous tree" under *Wong Sun.* These factors include the purpose and flagrancy of the misconduct, the presence of intervening circumstances, whether it is likely that the evidence would have been obtained in the absence of the illegality and the temporal proximity of the illegality and the evidence alleged to be the fruit of the illegality. *State v. Sickels,* 275 N.W.2d 809, 814 (Minn.1979).

■ We begin our analysis by noting that, in this case, the police misconduct was particularly flagrant and offensive. Consequently, the scope of exclusion becomes broader because the primary purpose of the exclusionary rule is the deterrence of police misconduct. *See* 4 LaFave, *Search and Seizure,* § 11.4(a) at 374 (2d ed.1987). Despite this broadened scope of exclusion, an application of the other *State v. Sickel* factors indicates that defendant's statement to Sigafoos was not the "fruit" of the earlier illegal statement. It is highly significant that, sometime during the 5 hours between the two statements on August 30, defendant initiated the contact with police which led to his statement to Sigafoos. Not only is this an intervening circumstance which arguably suffices to erase any taint, but, coupled with the fact that defendant had asked to speak with police before his statement to Roman, it indicates that defendant would have given an additional statement to police even if Roman had not violated defendant's right to counsel.

Before continuing, we pause to condemn vigorously the police actions in this case. A delay of more than 24 hours in responding to defendant's request for counsel, compounded by a deliberate reinitiation of interrogation before counsel was provided, is both inexplicable and inexcusable—inexplicable because every police officer is routinely instructed to avoid violation of an inmate's rights; inexcusable because such police misconduct, in the appropriate case, could result in a reversal of an otherwise proper conviction. In instances such as this, perhaps it would be better to punish police officers who violate the rights of inmates rather than exclude the evidence. However, the United States Supreme Court has adopted the exclusionary rule to remedy these violations.

■ Notwithstanding the police misconduct here, the trial court's error in admitting the statement taken by Roman will not result in reversal of defendant's conviction if the error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); *State v. Robinson,* 427 N.W.2d 217, 224 (Minn.1988). In utilizing the harmless error analysis, the trial court's error must be considered within the broad context of all the facts. An error is harmless beyond a reasonable doubt if the record contains overwhelming evidence of guilt and the statement was merely cumulative and could not have played a significant role in the trial court's conviction. *Id.; State v. Forcier,* 420 N.W.2d 884, 886–87 (Minn.1988).

■ The evidence which established that defendant was not legally insane at the time of the homicide was strong. The testimony of the state's expert and the report of Dr. Finkelstein convincingly countered the testimony of defendant's two experts. In addition, defendant's statement to Sigafoos contradicts his claim that he had no memory of the offense and had suffered a psychotic blackout.

Defendant's statement to Roman is cumulative and less significant as a result of his statement to Sigafoos. The two statements were virtually identical. The only substantial difference is that, in the statement to Roman, defendant described in his own words his state of mind during the homicide. While this description does not help his case, the import of this statement was not that it contained the defendant's views about his state of mind, but that it established that defendant could recall the events immediately before and during the homicide. The trial court judge could have derived this same conclusion solely from

the statement given to Sigafoos. Based on these circumstances, we are satisfied beyond a reasonable doubt that the admission of defendant's statement to Roman did not play such a significant role in the conviction that the trial court would have reached a different verdict if the statement had not been admitted. *Id.* at 887; *see also Robinson,* 427 N.W.2d at 224 (an appellate court must independently evaluate the evidence to determine whether or not the average factfinder would have changed its verdict had the questioned statement been excluded).

The same evidence which renders the admission of the illegal statement harmless is also sufficient to support the trial court's finding that defendant was not legally insane at the time of the murder. Thus, while we again express our concern with the police conduct in this case, we are compelled to affirm the conviction.

KEITH, J., took no part in the consideration or decision of this matter.