**STATE of Minnesota, Respondent,**

v.

**Kenneth Wayne PILCHER, Appellant.**

**No. C0-90-1960.**

Supreme Court of Minnesota.

July 26, 1991.

John Stuart, State Public Defender, Michael F. Cromett, Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Asst. Atty. Gen., St. Paul, for respondent.

GARDEBRING, Justice.

Kenneth Wayne Pilcher was convicted of three counts of first degree murder (premeditated; felony murder while committing or attempting criminal sexual conduct; felony murder while committing a kidnapping) and two counts of second degree murder (intentional; unintentional death while committing a robbery) in the death of Elisa Sue Martinez. Appealing from the judgment of conviction, Pilcher claims the evidence is insufficient to support his convictions for premeditated murder and felony murder while committing or attempting criminal sexual conduct. Pilcher also claims the trial court erred in admitting statements he made to the police and that those statements were the product of police coercion. He also challenges the prosecutor's conduct before the grand jury. We affirm in all respects.

### I.

On the morning of February 17, 1990, the frozen body of Elisa Sue Martinez was found. Lying on its back with legs apart, the body was discovered atop the shelled corn in an abandoned corn granary not far from where Martinez's car had gone into the ditch along a remote stretch of county road in western Minnesota. Two sets of footprints in the snow led from the car to the granary, but a single set of snowy footprints led from the granary to a vacant farmhouse about a mile east of the granary. The owner of that farm reported to police that a blanket and camouflage hunting coat were missing from the farmhouse.

Injuries to the body included substantial bruising overall and severe trauma to the head apparently caused by a blood-stained, wooden board found next to Martinez's leg. Blood spatters on the walls surrounding the head and body indicated that blows were struck while Martinez was lying on the floor. Under her shirt, Martinez's bra was pushed up, exposing her breasts. The zipper of her jeans was not fully closed, and her underwear had been pushed down over her hips. The autopsy discovered dirt and debris in the pubic area and revealed that Martinez had suffered manual strangulation and closed head trauma. An investigation of Martinez's car discovered blood consistent with Martinez's on a paper tissue and on the passenger side upholstery. Approximately two miles from where the car was found, in the direction from which her car had come, Martinez's coat, mittens, scarf, and right shoe were found alongside the road. Although she had left home the night before carrying a twenty dollar bill, no money was found on Martinez's body.

While en route to investigate the granary, Browns Valley Police Chief Gary Klempke was stopped by Doris Piechowski, who, with her husband Neil, lives on the same road as the granary. Piechowski informed Chief Klempke that Kenneth Pilcher, dressed in a camouflage coat and blanket, had appeared on their doorstep at 3:00 a.m. that same morning seeking a ride into town. Doris Piechowski described how Pilcher, whose face was bleeding, explained that a white girl and a Mexican man had given Pilcher a ride after his car had gone into a ditch but that they had left him out in the country. The Piechowskis were first reluctant to drive to town, but when Pilcher offered five dollars, Neil Piechowski accepted. In payment for the ride, Pilcher handed Neil Piechowski a twenty dollar bill. Having brought no money, Piechowski said he would return the change later. Pilcher then asked if Neil Piechowski would take the blanket and coat worn by Pilcher back to the farm from which Pilcher had taken them, but Piechowski refused. A subsequent investigation of the Piechow-

ski car discovered corn on the floor where Pilcher had sat.

The evidence presented at trial indicated that Pilcher spent February 16, 1990 driving around the countryside drinking beer and other alcoholic beverages. Beginning in the early afternoon, Pilcher, accompanied by his uncle and aunt, drove to Sisseton, South Dakota, where they visited friends and consumed more beer and liquor. Pilcher's aunt, Louise DeMarrias, testified that they also smoked several marijuana cigarettes while in the car and later at her home. Around 8:30 p.m. that evening, Pilcher and his friend Derrick Redday left the DeMarrias home to pick up Pilcher's girlfriend, Terri Wilson, and another friend, Shelly Pederson. The foursome then drove back to Sisseton, Pilcher and Redday drinking as Pilcher drove. Later, Pilcher quarreled with his girlfriend and then took her home at 11:30 p.m. that evening. Pilcher then suggested that Pederson go get one of her girlfriends for him, but she refused. During the drive to Pederson's home in the neighboring town of Beardsley, the car slid off the road into a ditch. As Pilcher tried to push the car out, a passing car stopped. Pilcher climbed in, and the car drove off.

Pilcher was taken into custody by Browns Valley Police Chief Gary Klempke at 10:30 a.m. on February 17th, 1990, roughly two hours after the discovery of Martinez's body. After placing Pilcher in the rear of the police car, Chief Klempke read the *Miranda* warning. Pilcher acknowledged that he understood his *Miranda* rights and asked, "Do you think I should have an attorney?" Chief Klempke responded that Pilcher could have an attorney if he wanted one. Pilcher did not then request an attorney and Chief Klempke did not ask any questions of Pilcher.

While waiting at the police station, Pilcher remained very talkative, discussing a number of subjects including Pilcher's whereabouts the previous evening. Because of Pilcher's loquaciousness, Chief Klempke repeated the *Miranda* warning and reminded Pilcher that he did not have to speak. Without goading or provocation,

Pilcher told Chief Klempke that a white girl and a Mexican male had left Pilcher out in the country after picking him up when his car had broken down. Concerned that other persons may have been near the crime scene, Chief Klempke asked what happened to the white girl and the Mexican man. Pilcher said he did not know. However, Pilcher alerted Chief Klempke to injuries Pilcher received during a struggle with the white girl and the Mexican man when they were ejecting Pilcher from their vehicle.

Around 2:00 p.m. that afternoon, Bureau of Criminal Apprehension Agent Philip Wagner and Traverse County Sheriff Donald Montonye began interrogating Pilcher in the kitchen of the Traverse County Law Enforcement Center. Although Agent Wagner was carrying a tape recorder, the device was not activated when the officers first approached Pilcher. Aware of Pilcher's equivocal statement regarding counsel, Agent Wagner began the interrogation by re-reading the *Miranda* warnings. Pilcher responded that he thought he should have an attorney. Agent Wagner then rose to leave, telling Pilcher that they could not speak. Pilcher stated that he wanted to tell his side of the story. Agent Wagner explained that if Pilcher wanted an attorney that Agent Wagner could not speak with him legally and again started to leave. Pilcher again stated that he wanted to tell his side of the story, at which point Agent Wagner explained that they could speak only if Pilcher waived the right to an attorney and if the entire discussion was tape recorded. Pilcher agreed. The tape recorder was then activated, recording both Agent Wagner's recitation of the *Miranda* warnings and Pilcher's waiver of his right to counsel.

During the interrogation, Pilcher said that he had been picked up by a white girl and a "big Mexican guy" when his car had gone into a ditch, but that they drove him out into the country and abandoned him. Pilcher also reported that he took a blanket and camouflage jacket from an abandoned farmhouse and that he paid a farmer for a ride into town. As the interrogation progressed, however, Pilcher's story changed

as Agent Wagner discussed the nature of the evidence that had then come to light and the types of charges that might result based upon that evidence. Eventually, Pilcher broke down in tears and admitted his involvement in the death of Martinez. Recanting earlier statements that he was "clear headed" and "knew what was going on at all times," Pilcher stated he was "pretty drunk" when the incident occurred. Later that evening, the blood stained clothes and boots Pilcher had worn the night before together with a camouflage coat and blanket were seized from his home.

At his trial, defense counsel conceded that Pilcher was responsible for the death of Martinez, but argued that Pilcher was intoxicated at the time of the murder. The jury convicted Pilcher of three counts of first degree murder (premeditated; felony murder while committing or attempting criminal sexual conduct; felony murder while committing a kidnapping) and two counts of second degree murder (intentional; unintentional death while committing a robbery) in the death of Elisa Sue Martinez.

## II.

■ Pilcher first challenges the admission of statements made at arrest, claiming that the police ignored his explicit invocation of his *Miranda* right to counsel. Both sides agree that Pilcher made an equivocal request for counsel by asking whether Chief Klempke thought Pilcher should have an attorney. When an accused equivocally or unequivocally invokes his right to counsel, further questioning of an accused must stop, but when that request is equivocal narrow questions designed to "clarify" the accused's true desires respecting counsel may be posed. *State v. Robinson*, 427 N.W.2d 217, 222–23 (Minn.1988); *see also State v. Hale*, 453 N.W.2d 704, 708 (Minn. 1990) (fleeting, off-hand comment about future need for attorney not an invocation of right to counsel). While the officer was entitled to clarify Pilcher's desires regarding counsel, it appears from the record that no interrogation ensued. Pilcher effectively waived the equivocally invoked right to

counsel by initiating further discussions with the police while having a full appreciation of his rights. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *State v. Warndahl*, 436 N.W.2d 770, 775 (Minn.1989); *State v. Campbell*, 367 N.W.2d 454, 459 (Minn.1985). The record reflects that Pilcher talked continually without police interrogation or inducement, and the trial court properly admitted those statements made at arrest.

■ In a similar vein, Pilcher claims his later invocation of counsel before being questioned by Agent Wagner and Sheriff Montonye was also ignored. Pilcher charges the interrogating officer's conduct amounted to a psychological ploy aimed at wheedling a waiver of his right to counsel. Such a characterization misconstrues the record that shows, as the trial court found, that Pilcher understood the very rights he chose to waive.

The record shows that Agent Wagner approached Pilcher knowing of Pilcher's equivocal invocation of the right to counsel. With that in mind, Agent Wagner re-read the *Miranda* warnings to Pilcher. When Pilcher stated he thought he should have an attorney, Agent Wagner told Pilcher that they could not speak if Pilcher wanted an attorney and rose to leave. Pilcher immediately protested, insisting that he be allowed to "tell [his] side of the story." In attempting to clarify Pilcher's seemingly inconsistent desires, Agent Wagner explained that they could not speak if Pilcher wanted to speak with an attorney. Again, Pilcher insisted that he tell his side of the story. Agent Wagner then explained that they could speak only if Pilcher first agreed to waive counsel and agreed to make the statement on tape. Pilcher agreed, and emphatically waived his right to counsel on tape. As the record reveals and the trial court found, Pilcher waived the right to counsel that had been invoked. *See Warndahl*, 436 N.W.2d at 772; *Campbell*, 367 N.W.2d at 459. Nevertheless, we are troubled by conduct and judgment ex-

ercised by these law enforcement professionals.

In *Robinson,* this court observed that disputes over an accused's claims of denial of constitutional rights would be eliminated if police interrogators would electronically record, not just the commencement of the actual interrogation, but the entire conversation with an accused relative to the accused's constitutional rights. *Robinson,* 427 N.W.2d at 224 n. 5. The present case provides a stellar example of a dispute that could have been avoided had the law enforcement officers followed our recommendation in *Robinson.* In the future, we urge that law enforcement professionals use those technological means at their disposal to fully preserve those conversations and events preceding the actual interrogation. Law enforcement personnel and prosecutors may expect that this court will look with great disfavor upon any further refusal to heed these admonitions.

### III.

█ Pilcher also claims his statement was the product of improper police tactics and coercion. The voluntariness of a confession is an issue separate from the *Miranda* issues, and it must be shown by a preponderance of the evidence. *State v. Andrews,* 388 N.W.2d 723, 730 (Minn.1986); *State v. Wajda,* 296 Minn. 29, 31–32, 206 N.W.2d 1, 2–3 (1973). Blood of the accused is not the only hallmark of an unconstitutional inquisition, *see Blackburn v. Alabama,* 361 U.S. 199, 206, 80 S.Ct. 274, 279–80, 4 L.Ed.2d 242 (1960), and the use of promises, trickery, deceit, and stress-inducing techniques in obtaining confessions have all been condemned. *See State v. Garner,* 294 N.W.2d 725, 727 (Minn.1980); *State v. Orscanin,* 283 N.W.2d 897, 899 (Minn.1979), *cert. denied* 444 U.S. 970, 100 S.Ct. 464, 62 L.Ed.2d 385 (1979); *see also Leyra v. Denno,* 347 U.S. 556, 559–60, 74 S.Ct. 716, 718–19, 98 L.Ed. 948 (1954) (interrogation by psychiatrist posing as physician to treat accused's sinus problems). Pilcher's allegations of improper interrogation techniques center on Agent Wagner's "empathetic approach," the comments about premeditated murder, and Pilcher's subsequent emotional breakdown.

█ From the outset, we note that Agent Wagner's actions during the interrogation encouraged Pilcher's inculpatory statements. *See Stein v. New York,* 346 U.S. 156, 186, 73 S.Ct. 1077, 1093–94, 97 L.Ed. 1522 (1953) (no criminal confession is ever voluntary in sense that a defendant wants to make it). The judicial inquiry, however, is not concerned with whether the police actions contributed to the utterance of inculpatory statements. Rather, in a subjective factual inquiry, the court examines the effect that the totality of the circumstances had upon the will of the defendant and whether the defendant's will was overborne when he confessed. *State v. Jungbauer,* 348 N.W.2d 344, 346 (Minn. 1984); *see Schneckloth v. Bustamonte,* 412 U.S. 218, 225–26, 93 S.Ct. 2041, 2046–47, 36 L.Ed.2d 854 (1973). Thus, our inquiry examines whether Agent Wagner's actions, together with other circumstances surrounding the interrogation, were so coercive, so manipulative, so overpowering that Pilcher was deprived of his ability to make an unconstrained and wholly autonomous decision to speak as he did. This inquiry includes consideration of such factors as the defendant's age, maturity, intelligence, education, experience and ability to comprehend; the lack of or adequacy of warnings; the length and legality of the detention; the nature of the interrogation; and whether the defendant was deprived of physical needs or denied access to friends. *Jungbauer,* 348 N.W.2d at 346.

█ At the time of the interrogation, Pilcher was twenty years old, high school educated, and had prior experience with the criminal justice system. He had been in custody roughly four hours and had received several *Miranda* warnings before being questioned. The transcript reveals Pilcher understood he was arrested for homicide, that it was a serious charge, and that he was the prime suspect. That the interrogating officers chose a sympathetic approach does not, in itself, render Pilcher's statements involuntary. *See Beckwith v. United States,* 425 U.S. 341, 343, 96

S.Ct. 1612, 1614–15, 48 L.Ed.2d 1 (1976) (sympathetic approach used but resulting confession held voluntary); *Winfrey v. Wyrick*, 836 F.2d 406, 411–12 (8th Cir.1987) (defendant spoke with friendly jailer); *Miller v. Fenton*, 796 F.2d 598, 607 (3rd Cir. 1986) (empathetic approach used), *cert. denied* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986). The transcript does not suggest Pilcher falsely believed Agent Wagner represented something other than an adversarial role as the questioner, and Pilcher's own comments, remarking that the police were trying to make him admit to something he did not do, displayed Pilcher's wariness of the police and their tactics.

■ The interrogation, which lasted less than two hours, took place in the kitchen of the law enforcement center and was conducted by two officers, one uniformed and the other in plain clothes. Agent Wagner commenced the interrogation only after completing a preliminary investigation of the relevant crime scenes, which revealed Pilcher's physical and temporal proximity to those locations. Statements made by Agent Wagner regarding the scientific evidence and possible punishment were truthful and honest; first degree murder carries a mandatory life sentence and the victim's hair and blood were recovered from Pilcher's clothing. It is not improper to inform a defendant of the possible charges or evidence marshalled against the defendant. *State v. Slowinski*, 450 N.W.2d 107, 112 (Minn.1990); *State v. Merrill*, 274 N.W.2d 99, 107 (Minn.1978). While an emotionally distressed defendant should be allowed to become composed before making a confession, *see State v. Brown*, 345 N.W.2d 233, 238 (Minn.1984), this concern arises where an accused's emotional state threatens the accused's ability to freely and voluntarily make inculpatory statements. *Id.; see Andrews*, 388 N.W.2d at 730. Pilcher's emotional breakdown does not detract from the

coherence and responsiveness he displayed throughout the interrogation where, despite his "emotional breakdown," Pilcher repeated the fiction of there being a "big Mexican guy" in the car. That he adhered to this woven tapestry of lies shows that Pilcher's will was not overborne.

Having reviewed the recorded interrogation session and the totality of the circumstances surrounding the interrogation, we conclude that Pilcher understood the shadow of suspicion in which he stood and was not deprived of his ability to make an unconstrained and wholly autonomous decision to speak as he did. We do, however, take exception to the police statement that Pilcher should remain in custody for his own protection. While the truth of the statement is unknown, the statement is coercive, implying an unspecific threat of physical harm to Pilcher were he to be released. *See Payne v. Arkansas*, 356 U.S. 560, 564–65, 567, 78 S.Ct. 844, 848–49, 849–50, 2 L.Ed.2d 975 (1958) (coerced confession where interrogating officer promised the accused protection from an angry mob gathered outside if he confessed); *Arizona v. Fulminante*, —— U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (informant insisted that accused confess before informant would protect accused from threats of physical harm inside prison); *cf. Garner*, 294 N.W.2d at 726–27 (physically intimidating police tactics carrying implicit threat of physical harm). We deplore the use of such tactics and do not doubt it had some effect, since Pilcher immediately sought the identity of those from whom he should be protected. Within the totality of the circumstances, however, the statement did not induce Pilcher to speak as he did or otherwise overcome his will.

### IV.

■ Pilcher contends the record, which includes evidence of intoxication,[1]

---

**1.** Although Pilcher asserts obliquely that the police intentionally delayed testing Pilcher for the presence of intoxicants, he does not claim a denial of due process. *See California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984) (establishing standard of constitutional materiality for destroyed evidence). No chemical test was administered before interrogation because (1) qualified intoxilizer operators were securing the crime scene, and (2) there was no indication Pilcher was or had been under chemical influence. Corroboration that Pilcher had imbibed was not received until roughly twelve hours after Pilcher's arrest.

does not contain sufficient evidence to support the convictions for premeditated murder or felony murder during an attempted sexual assault. In a first degree murder case, the court must determine, given the facts in the record and any legitimate inferences that can be drawn from those facts, whether a jury could reasonably conclude that defendant was guilty of the offense charged. *State v. Bias*, 419 N.W.2d 480, 484 (Minn.1988). Review of the evidence is done in a light most favorable to the prosecution and assumes that the jury believed the state's witnesses and disbelieved any contrary evidence. *State v. Ulvinen*, 313 N.W.2d 425, 428 (Minn.1981). Circumstantial evidence in a criminal case is entitled to as much weight as any other kind of evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except for that of guilt. *State v. Jacobson*, 326 N.W.2d 663, 666 (Minn.1982).

Pilcher claims witness testimony, his erratic driving, and his own behavior support a conclusion of intoxication. A defendant's state of intoxication at the time of a killing may be considered by a jury in determining whether the defendant acted with intent and premeditation, but the fact that a defendant consumed intoxicants before a killing does not raise a presumption that the defendant was incapable of premeditation or intent. *State v. Merrill*, 274 N.W.2d 99, 111 (Minn.1978). Although Pilcher drove his car into the ditch that night, the evidence also shows Pilcher drove throughout the evening without complaint from his passengers, neither of whom attributed the traffic mishap to Pilcher's driving. Pilcher also rifled Martinez's clothing for money and sought warmer clothing from a nearby farmhouse. Pilcher walked to neighboring farms and negotiated a ride into town. Testimony from the farmers described Pilcher as "normal" and "sober." That one of Pilcher's boots had been washed off and that Pilcher's T-shirt and bloody socks were seized

from his laundry room suggests Pilcher knew enough to erase telltale signs of his crime. Despite the existence of some evidence to the contrary, the conclusion reached by the jury on the intoxication issue is supported by the evidence. *State v. Neumann*, 262 N.W.2d 426, 432 (Minn. 1978).

The evidence of premeditation is also sufficient to support conviction. The statute defines premeditation as to "consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn.Stat. § 609.18 (1990). The requisite plan to commit first degree murder can be formulated virtually instantaneously. *Neumann*, 262 N.W.2d at 430. Premeditation is usually inferred from the totality of the circumstances surrounding the crime. *State v. Buchanan*, 431 N.W.2d 542, 547 (Minn.1988). While length and severity of a beating could show premeditation, *State v. Walker*, 306 Minn. 105, 120, 235 N.W.2d 810, 820 (1975), *cert. denied* 426 U.S. 950, 96 S.Ct. 3172, 49 L.Ed.2d 1187 (1976), a mere series of blows is not enough to justify finding premeditation. *State v. Swain*, 269 N.W.2d 707, 714 (Minn. 1978) (victim killed by seven blows to the head). Likewise, death by strangulation, by itself, does not support an inference of premeditation. *See State v. Hyatt*, 402 N.W.2d 614, 617 (Minn.App.1987) *rev. dismissed* (Minn. April 29, 1987). However, a severe beating together with other circumstances may be sufficient to sustain a finding of premeditation. *See State v. McCullum*, 289 N.W.2d 89, 92 (Minn.1979).

The medical examiner could not tell with certainty how long it took to inflict the injuries on Martinez. The evidence shows, however, that at least three separate instrumentalities were used in the killing: the wooden board to beat, Pilcher's boot to kick, and finally, Pilcher's hands to manually strangle the victim to death. Blows from the board and Pilcher's boot were struck while Martinez lay in a supine position. In addition, substantial force of the strangulation snapped the hyoid bone

In short, there is no allegation of official animus toward Pilcher or of a deliberate effort to

deprive him of exculpatory evidence. *Trombetta*, 467 U.S. at 488, 104 S.Ct. at 2533–34.

in Martinez's neck. The presence of hemorrhaging around the neck indicates that Martinez was still alive when strangled. This bolsters the jury's verdict, since the jury might infer that Pilcher could not beat Martinez with the board while at the same time strangling her. *Cf. McCullum*, 289 N.W.2d at 92. Events before and after a death can also support an inference that the defendant acted with premeditation. *Andrews*, 388 N.W.2d at 728. Before arriving at the granary, Pilcher had struggled with and wrested control of the car from Martinez. He then took her into the abandoned corn granary along a remote stretch of road with which he was familiar. After striking her but before departing the scene, Pilcher looted the body. This conduct, together with the injuries sustained by Martinez, support the jury's conclusion that the killing was premeditated.

■■■ Pilcher was convicted of causing death while committing or attempting to commit criminal sexual conduct in the second degree with force or violence. Minn. Stat. §§ 609.185(2); 609.343, subd. 1(e)(i) (1990). Criminal sexual conduct requires "sexual contact" with sexual or aggressive intent. Minn.Stat. § 609.341, subd. 11(a) (1990); *see* Minn.Stat. § 609.17, subd. 1 (1990) (definition of attempt). Pilcher claims the evidence of a sexual assault is wholly consistent with a struggle and his innocence. The evidence presented by the state, through the testimony of the medical examiner, suggested the occurrence or attempt of a sexual assault based on the position of the body, dirt and debris found in the buttocks and pubic area, the blood stained undergarments, the disheveled clothes, the manual strangulation, and the bruising in the left breast area. Injuries to a victim's intimate areas support an inference of sexual assault. *Cf. State v. Drieman*, 457 N.W.2d 703, 711–12 (Minn.1990) (injuries to victim's penis and anus). So too can the condition and posture of the victim's body support an inference of sexual assault. *Cf. State v. Fenney*, 448 N.W.2d 54, 56, 61 (Minn.1989) (victim found with intimate parts exposed). In addition, the evidence shows that Pilcher had quarreled earlier with his girlfriend and later asked Shelly Pederson to go pick up one of her girlfriends for him. This suggests a motivation for the assault and further undercuts Pilcher's assertion that the circumstantial evidence is consistent with some rational hypothesis other than guilt.

Following our painstaking review of the record and with due regard to Pilcher's presumption of innocence and the state's burden of proof, we hold the evidence sufficient for the jury to find Pilcher was proven guilty beyond a reasonable doubt of the offenses charged.

### V.

Pointing to several irregularities in the grand jury proceeding, Pilcher asserts the cumulative effect of these irregularities overpowered the will and independence of the grand jury process. The alleged irregularities include (a) an erroneous instruction regarding the defense of intoxication and the defendant's burden on that issue; (b) the presentation of an inadmissible statement made to police; (c) the presentation of unsworn testimony; and (d) prosecutorial misconduct that otherwise subverted the independence of the grand jury.

■■■ A grand jury proceeding is not a trial on the merits, rather it determines whether there is probable cause to believe that the accused committed a crime. *State v. Inthavong*, 402 N.W.2d 799, 801 (Minn. 1987). In seeking to overturn an indictment, a criminal defendant bears a heavy burden, especially where the defendant has been found guilty beyond a reasonable doubt following a fair trial. *State v. Scruggs*, 421 N.W.2d 707, 717 (Minn.1988). Pilcher has not met that burden here.

■■■ With the exception of the erroneous instructions, we have found nothing in the record to suggest that the prosecutor knowingly committed misconduct in the presentation of the evidence or that irregularities tainted the grand jury's decision to indict. *See State v. Montanaro*, 463 N.W.2d 281, 281 (Minn.1990); *State v. Moore*, 438 N.W.2d 101, 104–05 (Minn. 1989). The inadmissible statement aired before the grand jury was of no consequence where the evidence was otherwise sufficient to indict. *See State v. O'Dell*,

328 N.W.2d 730, 731 (Minn.1983); Minn. R.Crim.P. 18.06, subd. 2. The "unsworn" testimony, a pejorative label that we question, actually favored Pilcher by suggesting that his alcohol concentration may have been higher before it was tested by the police. Finally, the prosecutor repeatedly stressed that the grand jury would make all the decisions and that the prosecutor acts in an advisory capacity to the grand jury.

As for the erroneous instructions regarding intoxication,[2] Pilcher has shown no evidence of prejudice rising from the error. *Inthavong*, 402 N.W.2d at 802. Moreover, if prejudice were caused by some confusion over the instructions, that prejudice was diminished by the implicit rejection of the intoxication defense by the subsequent petit jury's verdict. We do, however, caution against future reliance on the instruction language we quoted in *State v. Wahlberg*, 296 N.W.2d 408, 418 (Minn.1980), and prosecutors in future grand jury proceedings should look to the jury instruction guides for direction. *See* 10 Minn.Dist. Judges Ass'n, *Minnesota Practice*, CRIMJIG 7.03 (1990); Minn.Stat. § 609.075 (1990).

Although the instructions provided on the issue of intoxication were erroneous, reversal of the indictment is not warranted. That error was rendered harmless beyond a reasonable doubt where the defendant demonstrated no prejudice from the error and the petit jury rejected the defense of intoxication. Moreover, nothing in the record suggests that the prosecutor abused his role as the representative of the state to unduly or unfairly influence the grand jury's decisions. *See State v. Johnson*, 441 N.W.2d 460, 466 (Minn.1989).

## VI.

In his pro se brief, Pilcher claims that defense counsel conceded guilt

without Pilcher's consent to that trial strategy. The decision whether or not to admit guilt at trial belongs to the defendant, and a new trial will be granted where defense counsel, explicitly or implicitly, admits a defendant's guilt without permission or acquiescence. *See State v. Moore*, 458 N.W.2d 90, 96 (Minn.1990) (defendant immediately objected at trial); *State v. Wiplinger*, 343 N.W.2d 858, 860 (Minn.1984) (defendant objected to attorney's representation). Pilcher was present when the concessions were made and, by his own admission, understood but did not dispute the tactic. These circumstances, together with the strong case which makes a concession of guilt an understandable trial strategy, show that Pilcher acquiesced to the conduct of defense counsel in impliedly admitting guilt. *Wiplinger*, 343 N.W.2d at 861. The remaining issues raised in Pilcher's pro se brief do not merit discussion.

Affirmed.

---

**2.** The prosecutor read the following instruction to the grand jury on the issues of intoxication and the defendant's burden:

At trial the burden of establishing intoxication to the required extent is going to be on the defendant. The defendant must establish the required degree of intoxication by a fair preponderance of the evidence. That means that it must be established by the greater weight of

the evidence. It must lead the factfinder to believe that it is more convincingly likely that the claim of the intoxication is true than it is not true.

Intoxication cannot be considered by the jury as a defense to a crime unless it was such [sic] a degree that the defendant did not know what he was doing or could not distinguish between right and wrong.