**STATE of Minnesota, Respondent,**

**v.**

**Michael Stanley ZABAWA, Appellant.**

**No. A09–1041.**

Supreme Court of Minnesota.

Aug. 19, 2010.

Lori Swanson, Attorney General, Peter R. Marker, Assistant Attorney General, St. Paul, MN; and Paul Dressler, Waseca County Attorney, Waseca, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Susan Andrews, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

DIETZEN, Justice.

Appellant Michael Stanley Zabawa was found guilty by an Olmsted County[1] jury of two counts of first-degree premeditated murder, four counts of first-degree felony murder (burglary and aggravated robbery), two counts of second-degree intentional murder, and two counts of second-degree felony murder, for the murders of Tracy Allen Kruger and Alec Dean Kruger on February 3, 2007. Additionally, Zabawa was found guilty of one count of attempted first-degree murder and one count of attempted second-degree murder, for the attempted murder of Hilary Ellen Kruger on the same date. The district court sentenced Zabawa to two terms of life without the possibility of release for the first-degree premeditated murders of Tracy Kruger and Alec Kruger, and 216 months for the attempted first-degree murder of Hilary Kruger. The sentences were ordered to run consecutively. On direct appeal, Zabawa argues that his statements were not voluntary, and that their admission into evidence deprived him of a fair trial. We affirm.

About 3:30 a.m. on February 3, 2007, the Waseca County Sheriff's Office received a 911 call from Alec Kruger to report that an intruder had just shot his parents, Tracy and Hilary Kruger. Alec, who was 13 years old, was on the phone with the 911 operator when gunshots were fired and the line went dead.

When police arrived at the roadway leading towards the Krugers' farmhouse, which is located several miles from Waseca, Minnesota, two vehicles were observed in the snow-filled ditch. An older model Chevy pickup truck was in the ditch on the south side of the road with its engine running, and a newer Ford Explorer (SUV) was in the ditch on the north side of the road with its engine shut off. Also observed was a strap attached to the front of the pickup truck, and a single set of shoe prints in the snow on the driver's side of both vehicles. A registration check revealed that the pickup truck was registered to Zabawa and the SUV was registered to Tracy Kruger.

Upon entering the Kruger residence, police heard a female voice upstairs, observed spent shotgun casings on the hallway floor, and discovered a 12–gauge shotgun in the bedroom doorway. Police found Hilary Kruger in critical condition; also, they found the bodies of Tracy and Alec Kruger. All had been shot multiple times. Hilary survived her injuries, but her medical care required several surgeries, including an arm amputation and extensive rehabilitation.

Subsequently, police conducted an investigation. Initially, police contacted the Krugers' neighbor located across the road, learned that his pickup truck was missing, and found fresh shoe prints near where the pickup truck had been parked. Less than an hour later, police found the missing pickup truck near Zabawa's house in Matawan, and observed shoe prints from the pickup truck "towards the direction of" Zabawa's house. Separately, the Sheriff's Department received a phone call from Zabawa that morning reporting that his pickup truck was missing, and that he

---

1. Due to pretrial publicity, the district court ordered that venue be changed from Waseca County to Olmsted County.

heard of a murder in Waseca near which the police found his pickup and that they were looking for him. During the phone conversation, Zabawa agreed to meet outside his residence with a BCA agent and a deputy investigator[2] for the Sheriff's Department. The police investigators told Zabawa they were investigating murders that had occurred in Waseca and asked to interview him at the Waseca police station. Zabawa agreed, and they travelled together to Waseca.

While travelling to Waseca, the police investigators advised Zabawa that he was not under arrest and gave him a *Miranda* warning. Zabawa responded that he understood his rights and agreed to speak with the police investigators. Because one of the police investigators smelled alcohol on Zabawa's breath, he asked whether Zabawa had been drinking. Zabawa admitted that he had four or five beers the previous night. Based on their observations, the police investigators concluded that Zabawa was not under the influence of alcohol.

Zabawa and the police investigators arrived at the Waseca Police Department at 8:15 a.m. and went to an interview room. The room had soft chairs, a coffee table, and a couch. The interview was video- and audio-recorded and lasted approximately 4 hours.[3] During the interview, Zabawa was reminded that he was not under arrest, and again was given a *Mi-*

*randa* warning; Zabawa again affirmatively waived his *Miranda* rights. Zabawa took three breaks to smoke cigarettes, and was provided with both coffee and a soft drink in the interview room. At noon, an investigator brought Zabawa a sandwich from McDonald's.

During the interview, Zabawa gave different accounts as to his whereabouts the past evening and early morning. Initially, Zabawa stated that he went to his girlfriend's house after work and returned home about 5 or 6 p.m.[4] Later, he stated that he was out drinking with a friend and returned home about 11 p.m. When police investigators told Zabawa his mother told them he did not come home until 3:30 a.m., Zabawa changed his story to state he left his friend's house about 2:30 a.m. Thereafter, Zabawa admitted that he lost control of his pickup truck and it ended up in the ditch, that he used the Krugers' SUV to attempt to pull his pickup truck out of the ditch, and that the Krugers' SUV ended up in the opposite ditch.[5] Zabawa also admitted that he stole the Krugers' neighbor's pickup truck and drove it home. But Zabawa denied that he went into the Kruger residence.

Toward the end of the interview, Zabawa admitted that he entered the Kruger residence looking for help. He stated that Tracy Kruger had a gun and threatened to kill him and that during the ensuing struggle the gun discharged several times, hit-

2. For ease of reference, the BCA agent and deputy investigator are referred to as the police investigators.

3. Based on the video recording, the interview began at about 8:15 a.m. and ended at about 12:20 p.m., or a little over 4 hours. The district court found that the interview was 4 hours and 23 minutes. The district court may have included the time spent en route to the Waseca police station.

4. Zabawa's purported girlfriend testified that their romantic relationship had ended by September 2006.

5. Zabawa had his cell phone with him but did not call for assistance. Due to a pending DWI charge, Zabawa was not supposed to either consume alcohol or drive. During the interview Zabawa stated, "I don't know what's gonna happen to me because I was drinking, that's the only thing I'm scared about."

ting Tracy and Hilary.[6] Zabawa stated that when he ran out of the house, he dropped the gun and it discharged and shot Alec.[7] Following the interview, Zabawa was placed under arrest.

Law enforcement also collected evidence at the Kruger and Zabawa residences. Pursuant to a search warrant, police obtained black slip-on shoes; and a pair of gloves, a grey shirt, and an Adidas jacket at Zabawa's residence, which tested positive for the presence of blood. The bloodstain on the grey shirt contained DNA from Alec, and the bloodstains from the Adidas jacket and right glove contained a partial DNA profile matching Alec. An evidence technician concluded that the black slip-on shoes were consistent with the shoe prints found at the Kruger residence, the Krugers' neighbor's residence, and the location of the stolen pickup truck in Matawan leading directly towards Zabawa's residence.

At the Kruger residence, police discovered an unlocked gun cabinet in the basement. The gun cabinet was missing a shotgun, and ammunition was strewn around the floor. The gun located upstairs was a 12–gauge Winchester pump-action shotgun.[8] The extended magazine on the shotgun had a capacity of eight shells, and was used to fire eight spent shotgun shell casings recovered from the upper hallway of the Kruger residence.

Zabawa was interviewed again on February 4, 2007, and February 5, 2007. During the February 4 interview, Zabawa admitted that some of the gunshots were not accidental but were fired out of fear. During the February 5 interview, Zabawa admitted that Tracy lifted up a corner of the bed and that he shot Tracy through the mattress. He denied getting the shotgun from the gun cabinet in the basement and maintained that Tracy came out of the bedroom with the shotgun.

Zabawa was charged by complaint and later by indictment with two counts of premeditated first-degree murder in violation of Minn.Stat. § 609.185(a)(1) (2008); two counts of first-degree murder during the commission of burglary in violation of Minn.Stat. § 609.185(a)(3) (2008); two counts of first-degree murder during commission of aggravated robbery in violation of Minn.Stat. § 609.185(a)(3); two counts of second-degree intentional murder in violation of Minn.Stat. § 609.19, subd. 1(1) (2008); and two counts of second-degree felony murder in violation of Minn.Stat. § 609.19, subd. 2(1) (2008), related to the murders of Tracy and Alec, and one count of attempted first-degree premeditated murder in violation of Minn.Stat. §§ 609.185(a)(1) and 609.17, subd. 1 (2008); and one count of attempted second-degree intentional murder in violation of Minn. Stat. §§ 609.19, subd. 1(1) and 609.17, subd. 1, related to the attempted murder of Hilary Kruger.

At trial, Hilary testified that the SUV was parked in their driveway that night with the keys in the ignition.[9] She testified that she was awakened in the early morning when she was shot in her bed.

---

**6.** Forensic evidence established that some of Tracy's injuries were inflicted from 8– to 10– feet away. No gunpowder residue was found on Tracy's hands.

**7.** Alec was shot three times. A firearms examiner testified that she performed "drop testing" of the shotgun and that when she dropped the shotgun, it never discharged.

**8.** Two of Tracy's siblings identified the shotgun as belonging to Tracy.

**9.** During the interview, Zabawa admitted that upon opening the door to the SUV, he saw the keys in the ignition and then used the garage door opener to gain access to the Kruger residence.

Tracy responded by lifting up the mattress, presumably to protect them, and then she heard three more gunshots. Tracy was shot twice and bled to death at the scene. Hilary heard the intruder go downstairs and thought he had left the house. She yelled to her son Alec to call 911, and then heard him saying that an intruder had shot his mom and dad. Subsequently, she heard shots fired. Then Alec was shot and bled to death in his parents' bedroom. Zabawa's statements were also introduced into evidence. The State presented other evidence consistent with the results of its investigation. Zabawa did not testify.

Following the trial, the jury found Zabawa guilty of all counts. The district court sentenced Zabawa to two terms of life without the possibility of release for the first-degree premeditated murders of Tracy Kruger and Alec Kruger, and 216 months for the attempted first-degree murder of Hilary Kruger. The sentences were ordered to run consecutively. The other counts were not adjudicated.

## I.

 Zabawa argues that he was deprived of a fair trial because his statements[10] were not voluntary.[11] The Due Process Clause of the Fourteenth Amendment prohibits the admission into evidence of a statement that was not voluntarily given. *State v. Biron,* 266 Minn. 272, 281,

123 N.W.2d 392, 398 (1963). The State must establish by a preponderance of the evidence that a statement was voluntary. *State v. Riley,* 568 N.W.2d 518, 525 (Minn. 1997). We review the district court's legal determination of whether a defendant's statement was voluntary de novo. *Riley,* 568 N.W.2d at 525; *State v. Farnsworth,* 738 N.W.2d 364, 373 (Minn.2007). But we accept the underlying factual determinations of the district court regarding the circumstances of the interview unless the findings are clearly erroneous. *Riley,* 568 N.W.2d at 525; *Farnsworth,* 738 N.W.2d at 373.

 We review the totality of circumstances to determine whether the State met its burden to establish that a statement was voluntary. *State v. Williams,* 535 N.W.2d 277, 287 (Minn.1995). The ultimate question of voluntariness is whether the defendant's will was overborne at the time of the confession. *Farnsworth,* 738 N.W.2d at 373. We examine whether police actions, together with the other circumstances surrounding the interview were so coercive, manipulative, and overpowering that the defendant was deprived of his ability to make an independent decision to speak. *Id.; State v. Pilcher,* 472 N.W.2d 327, 333 (Minn. 1991). Relevant factors include the defendant's age, maturity, intelligence, education, experience, and ability to comprehend. *State v. Ritt,* 599 N.W.2d 802, 808

---

10. Zabawa made three statements. The primary statement at issue was made on February 3, 2007. The subsequent statements were made on February 4, 2007, and February 5, 2007. Zabawa challenges the admissibility of the subsequent statements based on the fruit-of-the-poisonous-tree doctrine. *State v. Warndahl,* 436 N.W.2d 770, 775–76 (Minn.1989) (explaining that evidence obtained by the exploitation of illegal actions of the police should be suppressed under doctrine of fruit of the poisonous tree). Because we conclude that the February 3, 2007, statement was vol-

untary, Zabawa's fruit-of-the-poisonous-tree argument is moot.

11. Zabawa does not challenge the district court's ruling that he validly waived his *Miranda* rights, and therefore we decline to address it. *See State v. Farnsworth,* 738 N.W.2d 364, 374 n. 7 (Minn.2007) (concluding that because the defendant did not raise the issue, we would not consider the issue of a *Miranda* warning).

(Minn.1999). Also, we consider the nature of the interview, including its length, the lack of or adequacy of warnings, whether the defendant's physical needs were met or ignored, and whether the defendant was denied access to friends. *Id.*; *Pilcher*, 472 N.W.2d at 333.

The district court denied Zabawa's motion to suppress his statements made to the police investigators. In a 40–page memorandum, the district court found, among other things, that Zabawa was 24 years old, that he was "of at least average intelligence," and that based on his two DWI arrests, he had some prior experience with police. The district court concluded that Zabawa's statement was not coerced by the police investigators. The court reasoned that Zabawa was not "subject to the type of interrogation that would overpower his will," nor was his statement "induced by any promises that would make an innocent man confess."

On appeal, Zabawa raises four arguments. First, Zabawa argues that his lack of sleep [12] and intoxication sapped away his power of resistance, and rendered his statement involuntary.[13] Based on the sequence of events, Zabawa argues that the police investigators knew he had only slept for about 3-1/2 hours.[14] Also, Zabawa argues that the police investigators knew he had been drinking and therefore were required to "determine [his] level of intoxication."

■ Zabawa's statement was involuntary if his will was overborne by police during the interview. *See Riley,* 568

N.W.2d at 525. Lack of sleep and intoxication are factors that may be considered in determining whether a defendant's will has been overborne. But a lack of sleep does not automatically render a statement involuntary. *See Ritt,* 599 N.W.2d at 808, 810 (concluding that the defendant did not indicate that she was "overly tired," and further that she selected the time of the interview); *Williams,* 535 N.W.2d at 280 (concluding that a statement was voluntarily given although the defendant was incarcerated at about 1 a.m. and awakened for questioning at about 5:20 a.m.).

■ Similarly, intoxication is not necessarily proof of involuntariness. *Riley,* 568 N.W.2d at 525. But it can be an important factor. In *State v. Garner,* 294 N.W.2d 725, 726–27 (Minn.1980), we concluded that the intoxicated defendant was susceptible to the admitted police tactics of combining "stress-inducing techniques" with "trickery and deceit" to "frighten defendants into giving incriminating statements." Thus, we look at the totality of the circumstances to determine if a statement was voluntary. *Riley,* 568 N.W.2d at 525.

The district court's finding that Zabawa was not intoxicated at the time of the interview was not clearly erroneous. During the interview, Zabawa admitted that he was not intoxicated. The police investigators testified at the omnibus hearing that during the interview Zabawa answered their questions and did not appear intoxicated. The court found that Zabawa "did not look to be intoxicated or hung-over . . .

---

**12.** Zabawa failed to raise this issue before the district court. Because the issue is germane to the issue of intoxication, and the facts are not disputed, we will address it.

**13.** Zabawa contrasts himself with a "well-rested, sober, 'experienced' criminal suspect" in an attempt to show his susceptibility to police interview tactics.

**14.** Zabawa calculated the time period to begin when Alec called 911 at 3:24 a.m., and to end at 6:50 a.m., which was the time when Zabawa told the police investigators that he awakened.

and had no problems walking, maintaining balance ... and did not slur his words." Moreover, the lack of sleep does not necessarily render Zabawa's statement involuntary. Here, Zabawa awakened himself that morning, and initiated contact with the Sheriff's Department to report that his pickup truck was stolen.

■ Second, Zabawa argues that the police investigators' empathetic interview technique of posing as a friend was manipulative and coercive. An interview technique is improper if it overbears the defendant's will and renders his statement involuntary. *See Riley*, 568 N.W.2d at 525. But, "police must also be allowed to encourage suspects to talk," *State v. Merrill*, 274 N.W.2d 99, 108 (Minn.1978), and we have upheld empathetic tactics that prod suspects "to speak with [police] and cooperate," *State v. Thaggard*, 527 N.W.2d 804, 807 (Minn.1995); *see also Farnsworth*, 738 N.W.2d at 373 (concluding that a statement was voluntary although police placated the defendant by telling him they were just trying to get him "the best help" to ensure that he retained custody of his children); *Pilcher*, 472 N.W.2d at 333–34 (listing cases in which confessions were considered voluntary regardless of an empathetic approach). In *Pilcher*, the court concluded that the defendant was not fooled by the empathic approach because he continued to display "wariness" of police and their tactics. *Id.* at 334.

The district court found that the police investigators "seemingly rotate[d] compliments" with "insisting [Zabawa] was lying or being untruthful"; however, Zabawa was not "deprived of his ability to make an unconstrained and wholly-autonomous decision to provide the statements he did." The court observed that Zabawa displayed wariness towards the police investigators during the interview, and did not admit to anything unless he was confronted with

facts that refuted his story. Moreover, the court recognized that Zabawa never fully confessed to the crime, and that the police investigators made no promises in order to induce Zabawa's statement. Rather, the police investigators repeatedly advised Zabawa that there would be consequences for his conduct. On this record, the district court did not err in concluding that the interview technique used by the police investigators did not deprive Zabawa of his ability to make an independent decision to speak.

■ Third, Zabawa argues that the police investigators engaged in trickery and deceit, and repeatedly lied about the strength of their case. He argues that police investigators stated that they had a "mountain of physical evidence" against him, and that Hilary would be able to identify him as the intruder. He argues that it was a lie to tell Zabawa that Hilary "saw you" because Hilary had not identified Zabawa. Whether police have lied to obtain a statement is one factor we consider in determining whether the defendant's will was overborne. *Riley*, 568 N.W.2d at 526; *State v. Moorman*, 505 N.W.2d 593, 600 (Minn.1993) (concluding that defendant's statement was voluntary even though police lied to him about the evidence, in part, because there were no threats or physical intimidation involved). In *Williams*, the 4–year–old victim stated that a "black man had hurt him," and we concluded that although police, admittedly based on "pure speculation," told the defendant that the child would be able to identify him, the defendant's statement was still voluntary. 535 N.W.2d at 279, 281.

The record indicates that the police investigators stated they were going to investigate the scene and that they were *"going to* have a mountain of physical evidence" against him, including shoe print

evidence, clothing seized from Zabawa's house, and eyewitness identification. Near the end of the interview, the police investigators stated "there's evidence that shows you're in the house." Thus, the police investigators predicted what the investigation may establish. Also, the information given to the police investigators was that Hilary would survive. Hilary described the intruder to the police investigators as a tall, thin man, and there was no reason to believe that she would not be able to provide a more detailed description when her condition improved. The record indicates that police investigators told Zabawa that Hilary was *going to* survive. Moreover, the police investigators stated: "Ah, she saw ya. Okay? I have no doubt, okay? So, she'll be able to identify you, okay?" We conclude that the district court's finding that the police investigators did not engage in trickery or deceit is not clearly erroneous.

Fourth, Zabawa argues that the police investigators overbore his will by suggesting that he had a colorable defense to the shooting. Specifically, the investigator told Zabawa that "there's an exception in the burglary clause [for] if you have to go in their house because you needed to survive to get help." Additionally, Zabawa argues that the investigators were coercive in asking him seven times to agree that he went into the Kruger residence to get out of the cold.

We have ruled, however, that police comments about the law that do not involve actual or implied promises about the consequences of a defendant's statement do not render a confession involuntary. *Merrill*, 274 N.W.2d at 104, 107. *Compare Farnsworth*, 738 N.W.2d at 375 (concluding statement was voluntary when police implied that the defendant needed help, but did not state they had "special influence with the district court"), *State v.*

*Slowinski*, 450 N.W.2d 107, 111–12 (Minn. 1990) (concluding that the defendant's statement was voluntary although police "explained to him the various degrees of murder and encouraged him to explain what happened so that if there were mitigating circumstances, they would be considered in the charges filed"), *with Biron*, 266 Minn. at 277, 283, 123 N.W.2d at 396, 399 (concluding that the statement was involuntary because police essentially promised that the 18–year–old defendant would be tried in juvenile court if he confessed).

■ The district court found the police investigators did not promise Zabawa that he had a colorable defense that would exculpate him. The court found that the police investigators did not make any actual or implied promises except "to truthfully portray [Zabawa's] position before the prosecuting authorities." These findings are not clearly erroneous. Separately, we agree that repeatedly suggesting that a suspect's motive for entering the victim's residence was to get out of the cold in the hope of getting a different answer may be coercive in a particular situation. But, the suggestion was not coercive in this case because Zabawa's responses changed over the course of the interview. Based on the record, the police investigators' suggestions that Zabawa may have a colorable defense and their repeated suggestions of his motive for entering the Kruger residence did not render Zabawa's statement involuntary.

Finally, Zabawa argues that the cumulative effects of the police investigators' conduct during the interview rendered his statement involuntary. The record does not support this argument. Zabawa's interview was conducted in a setting consisting of a room with two chairs and a couch; indeed, the district court found that Zabawa "appeared quite relaxed throughout the

interview." Zabawa had access to friends and family during the entirety of the interview. He had his cell phone on him at all times, and received text messages during the interview. Zabawa's physical needs were also met. He was provided with coffee, a soft drink, and a sandwich around lunch time. He was also given three smoke breaks, and had the opportunity to use the restroom. Police did not physically intimidate Zabawa or use a threatening tone of voice or strongly confrontational questioning.

Based upon the totality of the circumstances surrounding Zabawa's interview, we conclude that his will was not overborne. Rather, Zabawa understood the gravity of his situation, and the consequences of his statement. Thus, Zabawa's statement was voluntarily given to the police investigators.

Affirmed.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.