*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1951**

State of Minnesota,
Respondent,

vs.

Jason DeWayne Kirk,
Appellant.

**Filed November 23, 2015
Affirmed
Hooten, Judge**

Morrison County District Court
File No. 49-CR-13-63

Lori Swanson, Attorney General, Michael Everson, Assistant Attorney General, St. Paul,
Minnesota; and

Brian Middendorf, Morrison County Attorney, Little Falls, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Roy G. Spurbeck, Assistant
Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Ross, Presiding Judge; Chutich, Judge; and Hooten,
Judge.

## UNPUBLISHED OPINION

**HOOTEN**, Judge

Appellant challenges his first-degree criminal sexual conduct conviction, arguing

that the district court erred by denying his motion to suppress his statement to law

enforcement and by excluding expert testimony regarding the issue of false confessions. We affirm.

**FACTS**

Appellant Jason Dewayne Kirk moved from Tennessee to central Minnesota in August 2011 to live with R.B., whom he had met on the internet. Kirk's relationship with R.B. became romantic shortly after he moved in with her, and he began providing childcare for R.B.'s young children, K.B. and T.B., on a regular basis.

On January 8, 2013, when K.B. was six years old, she was working on her homework at her grandmother's house. K.B.'s homework was to draw what she did last weekend, and her grandmother became concerned when K.B. drew a picture of a computer screen depicting a woman performing oral sex on a man. K.B.'s grandmother and grandfather went to R.B. and Kirk's house and told them about K.B.'s drawing. K.B. told her grandparents, her mother, and Kirk that the picture showed what she had seen on Kirk's computer.

R.B. contacted a child protection worker, who referred R.B. to Jeff Guith, a child protection investigator. Guith interviewed K.B., and the interview was videotaped. During the interview, K.B. initially did not recognize the picture that she drew, but later told Guith that the picture was of a movie she saw on Kirk's computer. K.B. explained that the movie was of a woman "hopping up on the boy where . . . he go peed." K.B. said that Kirk had shown her the video in the living room of their home when her mother was at work. K.B. said Kirk put his hand on her mouth and tried to move her mouth down to

2

his "tail." Guith clarified that "tail" meant penis. K.B. told Guith that Kirk had put his "tail" in her butt and that his "tail" was hard at the time.

After speaking with K.B., Sergeant Investigator Jeremy Luberts and Guith, who often assisted law enforcement in interviewing child abuse suspects, went to Kirk's job site. There, they asked Kirk to accompany them to the sheriff's office to discuss the allegations. Kirk was cooperative and agreed to speak with Guith and Luberts.

The three did not discuss the allegations during the ride to the sheriff's office. The interview took place in a small room with a table and some chairs. Kirk was told at the very start of the interview that the interview concerned "some inappropriate touching that occurred." Kirk was given a *Miranda* warning by Luberts, and he indicated that he understood his rights and was willing to speak with the investigators. Guith also informed Kirk of his privacy rights regarding the child protection investigation and told Kirk that he did not have to answer any of the questions that he was asked. Kirk indicated that he understood and that he wished to continue with the interview.

During the interview, which lasted just over one hour, Kirk initially denied watching pornographic movies with K.B. or inappropriately touching her. Kirk said that he had only touched her butt when helping her in the bathroom. When Guith suggested that maybe something happened when Kirk was half asleep or drinking, Kirk again denied that anything had happened. Guith suggested a number of times that people sometimes end up in bad situations and make a mistake, and that those people should get counseling.

3

Luberts stated that he could tell Kirk was hiding something from them and that "cooperation in these matters goes a long way." Luberts said that he was not looking to put Kirk away for life, and that he was just looking to get help for K.B. and for Kirk. Kirk again denied that anything happened. Guith, after reiterating that some people who abuse kids actually care about the kids and just made a mistake, said, "We have an enormous amount of power with the County Attorney's Office on how these cases end up. If we make recommendations . . . the County Attorney's Office almost always takes that into account." Luberts reiterated that cooperation was important and told Kirk that he was "very, very, very likely gonna' be charged with" this crime. Kirk still denied the allegations.

Guith told Kirk that the way that the case was handled would depend on whether Kirk cooperated:

> [I]f we have to prove this . . . through physical evidence from the doctor, through physical DNA evidence from you . . . this is gonna' be one of those cases that goes to the County Attorney's Office with our recommendation to get the most difficult, harsh sentence possible for you, which is gonna' be hard time in a state facility. If you are able to help us get to the bottom of this thing . . . we will make sure you get the proper kind of counseling. We will make sure that this is something that gets addressed and that you can have your family back together . . . .

Kirk again denied abusing K.B. Guith said Kirk seemed like a guy who ended up in a bad set of circumstances.

4

Guith stated that Kirk owed it to K.B. to admit what had happened:

> You owe it to [K.B.] after what happened, you made a mistake, and it's time for you to accept that that's done now, okay? . . . When I talk to victims of sexual abuse, what hurts them way more than the actual sexual act is people not believing them. . . . They're the person that this something bad happened to and then when they have the courage to talk about what happened, to then have people turn on them and say that they're lying. To have the person that sexually touched them turn on them and say, nope, that's a lie, okay? I know you have it within you. I can tell that you're the kind of person that has the ability to square up on this thing.

Kirk then stated that he was playing a computer game when K.B. came up to him and started rubbing his genitals. Kirk said that it felt like "somebody else was there controllin' me," and that he pulled up a porn site on his computer. Kirk stated that he showed K.B. his penis and that she started rubbing it. Kirk said that K.B. then went into the bathroom and was having trouble pooping. Kirk stated that he rubbed Vaseline on K.B.'s anus to help her poop and that he just got more aroused. Kirk then stated that he put his penis in K.B.'s anus for several seconds and that he ejaculated.

Kirk was charged with one count of first-degree criminal sexual conduct. At his first appearance, Kirk, appearing pro se, told the district court that his statement to law enforcement was made under duress. Later, Kirk, now represented by counsel, moved to suppress the statement he had given to law enforcement, asserting that it was involuntary because it had been obtained by coercion. The district court denied this motion. Before trial, Kirk sought permission to call an expert witness to testify regarding false confessions. The state moved to exclude such testimony, and the district court granted the state's motion.

The first trial ended in a mistrial. At the second trial, K.B. testified that Kirk had showed her a video of women putting their mouths on a man's penis and that Kirk had put his penis in her "back butt." At trial, the state played redacted versions of K.B.'s interview with Guith and the interview of Kirk at the sheriff's office.

Kirk testified on his own behalf and denied that he had ever sexually abused K.B. Kirk stated that on the day of the alleged abuse, he was home with K.B. and T.B. and allowed K.B. to watch him play a video game for a few hours. Kirk testified that he confessed to law enforcement because he was afraid that child protection would take the children away unless he confessed because child protection had previously removed the children from the house. He also stated that he thought that a therapist would recognize that he did not do the crime and that he did not have the type of personality to harm a child. Kirk testified that he tried to say things during the interview so that the investigators would think he was mentally ill, merely repeated details that they had told him, and was sleep deprived at the time. Kirk said that he frequently helped K.B. in the bathroom and that her statement regarding him putting his penis in her anus was probably a description of him cleaning her after she had defecated in her pants.

The jury initially told the district court that it was deadlocked, but after receiving further instructions, the jury again deliberated and found Kirk guilty. The district court sentenced Kirk to 144 months in prison. This appeal followed.

**D E C I S I O N**

Kirk challenges the district court's denial of his motion to suppress his confession as an involuntary statement. An appellate court "review[s] the voluntariness of a

6

confession de novo as a question of law based on all factual findings that are not clearly erroneous." *State v. Ritt*, 599 N.W.2d 802, 808 (Minn. 1999) (quotation omitted). In a pretrial hearing at which the defendant seeks to suppress a confession on the basis that it was involuntary, the state bears the burden to prove that the confession was voluntary by a "fair preponderance of the evidence." *State v. Thaggard*, 527 N.W.2d 804, 807 (Minn. 1995).

"The Due Process Clause of the Fourteenth Amendment prohibits the admission into evidence of a statement that was not voluntarily given." *State v. Zabawa*, 787 N.W.2d 177, 182 (Minn. 2010). In determining voluntariness, the question is whether the defendant's will was overborne. *Id.*

A court considers the totality of the circumstances when determining whether a statement was voluntary. *State v. Farnsworth*, 738 N.W.2d 364, 373 (Minn. 2007). The court must examine whether the actions of the police, along with other circumstances, were "so coercive, manipulative, and overpowering that the defendant was deprived of his ability to make an independent decision to speak." *Zabawa*, 787 N.W.2d at 182. However, the fact that police questioning encouraged inculpatory statements does not by itself render a confession involuntary. *State v. Pilcher*, 472 N.W.2d 327, 333 (Minn. 1991).

Relevant factors in determining whether a confession was voluntary include the defendant's intelligence, education, age, experience, maturity, and ability to comprehend. *Zabawa*, 787 N.W.2d at 182; *Ritt*, 599 N.W.2d at 808. The court also considers the nature and circumstances of the interview, including "its length, the lack of or adequacy

of warnings, whether the defendant's physical needs were met or ignored, and whether the defendant was denied access to friends." *Zabawa*, 787 N.W.2d at 183. The court must also consider the use of trickery and deception. *Thaggard*, 527 N.W.2d at 810. "If police use deception in an interrogation and it is the kind that would make an innocent person confess, the confession is involuntary and must be suppressed." *In re Welfare of D.B.X.*, 638 N.W.2d 449, 455 (Minn. App. 2002) (quotation omitted). Courts must consider whether promises were made and the substance of the promises in determining whether a confession was voluntary. *Id.* But, "the police must also be allowed to encourage suspects to talk." *Farnsworth*, 738 N.W.2d at 374 (quotation omitted). The Minnesota Supreme Court has upheld the use of empathetic techniques that encourage suspects to cooperate with law enforcement. *See id*. at 375 (concluding that the defendant's statement was voluntary, even though police had told the defendant they would try to get him "the best help" so he could retain custody of his children); *Pilcher*, 472 N.W.2d at 333–34 ("That the interrogating officers chose a sympathetic approach does not, in itself, render [the defendant's] statements involuntary.").

The district court found that Kirk's statement was voluntary. In reaching this conclusion, the district court considered the circumstances of the interview, the age, experience, and education of Kirk, and the tactics employed by law enforcement. Despite its overall finding that Kirk's statement to police was voluntary, the district court expressed some concern with the interview, noting that "Luberts and Guith came close to making promises to [Kirk] that they could not keep. Of particular concern is their assertion that they have 'enormous power' with the county attorney's office coupled with

8

their suggestion that a confession would lead to counseling and a reunification of [Kirk's] family." The district court concluded, however, that the tactics employed by Luberts and Guith were not so deceptive as to lead an innocent person to confess.

We agree. Kirk was advised of his rights and indicated that he understood them. At the time of the interview, Kirk was 32 years old and was employed. The district court noted that Kirk was "articulate and educated." Kirk had no trouble answering any questions and never indicated that he wanted to stop answering questions. Kirk, however, had only "limited prior involvement with law enforcement" before his arrest.

Here, the police chose the place and time of the interview. *See Ritt*, 599 N.W.2d at 809 (noting that the defendant had herself selected the time of the interview). Kirk was interviewed in the interview room at the sheriff's office, which is a small room with a table and chairs. The interview took place in the early afternoon and lasted approximately one hour. Kirk never asked for food, water, or an attorney. There was no indication that Kirk was intoxicated. Kirk was not threatened with physical abuse or promised that he would not be charged if he admitted to the crime. Instead, Kirk was advised that "[t]his is something that you're very, very, very likely gonna' be charged with and you're gonna' have to deal with."

Kirk argues that the statements and questions from Luberts and Guith are "of the character that would convince an innocent person to confess." Specifically, Kirk contends that the statements made by Luberts and Guith consisted of "threats of prison versus family unification and counseling" which "cross[ed] the line into an impermissible inducement to confess."

9

The Minnesota Supreme Court has "held that offers of help do not make a statement involuntary as long as the police have not implied that a confession may be given in lieu of criminal prosecution." *Farnsworth*, 738 N.W.2d at 374. In *State v. Slowinski*, the supreme court concluded that the defendant's confession was voluntary even though the police improperly suggested that they had influence with the county attorney because the officers did not promise that the defendant would receive psychiatric help instead of being sent to prison. 450 N.W.2d 107, 111–12 (Minn. 1990). In *Farnsworth*, the supreme court found the defendant's confession to be voluntary even though the officer said he was trying to get the defendant help so he could retain custody of his children because the officer's statements did not indicate that the defendant would not be prosecuted if he confessed. 738 N.W.2d at 375.

As in those cases, Luberts and Guith did not indicate at any time that Kirk would not be prosecuted if he confessed. Indeed, Kirk was informed that he was most likely going to be charged with this crime. Furthermore, while this court looks "with disfavor upon both implied and express promises made during an interrogation by police . . . such promises do not automatically render a confession involuntary." *Ritt*, 599 N.W.2d at 808. The promises that the investigators made here are tempered by the fact that the investigators were open about what they were investigating, gave Kirk adequate warnings, and told him before he confessed that he was likely to be charged with the offense. Additionally, Kirk was not intoxicated, was not deprived of any of his physical needs, and was not questioned for an excessive length of time. Despite the promises of

law enforcement, the totality of the circumstances indicates that Kirk's statement was voluntary.

Guith's claims that he had an "enormous amount of power" with the county attorney's office are troubling. But, Guith only told Kirk that the county attorney's office usually takes his recommendations into account. Though Guith may have improperly suggested that he had influence with the county attorney, he only told Kirk that he would make recommendations that the county attorney's office may take into account. Such statements are not the type of statements that would make an innocent person confess given the totality of the circumstances here. *See Slowinski*, 450 N.W.2d at 112 (holding that statements suggesting that the police had influence with the county attorney were improper, but did not render the confession involuntary under the totality of the circumstances). Furthermore, Kirk maintained his innocence after the investigators suggested that they had influence with the county attorney's office, and only confessed after Guith encouraged him to make things right with R.B. and K.B. And, Guith's use of techniques that appealed to Kirk's emotions and sympathies did not rise to the level of being so coercive as to deprive him of his right to remain silent. *See State v. Ganpat*, 732 N.W.2d 232, 240, 242 (Minn. 2007) (holding that a defendant's confession was voluntary when an investigator commented that he guessed the defendant had decided to "do the right thing for your family"). The district court correctly found that Kirk's statement was voluntary.

11

**II.**

Kirk challenges the district court's exclusion of proffered expert testimony regarding false confessions. "A criminal defendant has the right to a meaningful opportunity to present a complete defense." *State v. Penkaty*, 708 N.W.2d 185, 201 (Minn. 2006). "A criminal defendant has the constitutional due process right to call and examine witnesses, including expert witnesses, subject to the limitations imposed by the rules of evidence." *State v. Mosley*, 853 N.W.2d 789, 798 (Minn. 2014). Rulings concerning the admissibility of expert testimony "rest within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion." *State v. Hanks*, 817 N.W.2d 663, 667 (Minn. 2012) (quotation omitted).

A witness qualified as an expert may testify regarding scientific, technical, or other specialized knowledge if such testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." Minn. R. Evid. 702. To be admissible, expert testimony must be "helpful to the jury in fulfilling its responsibilities," and its relevance must outweigh "the danger of unfair prejudice, the potential for confusing the issues or misleading the jury, or other concerns." *Ritt*, 599 N.W.2d at 811 (citing Minn. R. Evid. 403). "[E]xpert testimony is not helpful if the expert opinion is within the knowledge and experience of a lay jury and the testimony of the expert will not add precision or depth to the jury's ability to reach conclusions." *State v. Sontoya*, 788 N.W.2d 868, 872 (Minn. 2010) (quotation omitted). The standard for determining whether expert testimony would be helpful is an objective standard. *Mosley*, 853 N.W.2d at 800.

Here, Kirk sought permission to call Dr. Deborah Davis as an expert witness to testify about false confessions. Kirk explained that Dr. Davis would testify regarding: (1) the occurrence of false confessions; (2) the occurrence of false confessions among people without mental illness or defect; (3) why false confessions occur and what factors might promote them; (4) how an innocent suspect could provide details of a crime without being present during the crime; and (5) how to tell the difference between true and false confessions. Kirk specified that Dr. Davis would not testify as to her opinion of whether Kirk was telling the truth. The district court excluded Dr. Davis's testimony regarding false confessions, stating that "the case law in this state strongly suggests that [Kirk's] proffered expert witness testimony is not admissible at trial."

Kirk argues that "[t]he trial court deprived [Kirk] of his constitutional right to present a complete defense when it excluded [Kirk's] expert witness who would have testified about the nature of false confessions." Specifically, Kirk argues that the proposed testimony is distinguishable from the testimony excluded in the cases cited by the district court. Kirk alleges that testimony regarding false confessions is instead analogous to expert testimony regarding battered woman syndrome or the effect of sexual abuse on children. Furthermore, Kirk argues that knowledge about false confessions has expanded significantly in recent years and that changes in such knowledge may require the "reevaluation of caselaw on the admissibility of expert evidence."

The district court cited two Minnesota Supreme Court cases in support of its decision that Kirk's proposed expert testimony would not be admissible at trial. In *Bixler v. State*, the defendant sought to introduce expert testimony regarding characteristics of

the defendant that made him susceptible to coercion. 582 N.W.2d 252, 254 (Minn. 1998). The supreme court upheld the district court's exclusion of the expert testimony, reasoning that the jury, without the testimony of the expert, was capable of observing the defendant's characteristics and taking those into account in evaluating his confession. *Id.* at 256. In *Ritt*, the defendant sought to admit testimony regarding a specialized technique of interrogation used by law enforcement. 599 N.W.2d at 810. The defendant in *Ritt* sought to have the expert witness take the jury through the tape of the defendant's interview to point out specific interview techniques. *Id.* The supreme court noted its concern that allowing expert testimony on the credibility of a witness's statement could turn into a battle between the experts:

> In most cases, even though an expert's testimony [regarding witness credibility] may arguably provide the jury with potentially useful information, the possibility that the jury may be unduly influenced by an expert's opinion mitigates against admission. Nor should the credibility of witnesses in criminal trials turn on the outcome of a battle among experts.

*Id.* at 811 (quotation omitted). The court affirmed the exclusion of the testimony, noting that "the jury had ample opportunity to evaluate the veracity of Ritt's statements to [the officer] and . . . expert testimony was unlikely to add either precision or depth to their evaluation." *Id.* at 812.

Kirk argues that the proffered testimony is distinguishable from *Bixler* and *Ritt* because it would be more general than the expert testimony in those cases. Kirk argues that "the testimony here is more like the testimony routinely allowed in Minnesota courts

14

to help juries understand the behavior of victims of criminal acts or to explain counterintuitive behavior of a defendant."

We disagree. Dr. Davis' testimony is comparable to the testimony that was excluded in *Bixler* and *Ritt*. Like the expert testimony excluded in *Ritt*, Dr. Davis' testimony was unnecessary for the jury to consider because the pressures of interrogation techniques are within the understanding of a lay juror. "Assessment of credibility is ordinarily within the understanding of a lay jury." *Id.* at 811. Kirk's entire interview was recorded, and the jury had the opportunity to hear the questions that were asked and the manner and tone of voice in which they were asked, giving the jury the ability to determine whether the interrogation tactics elicited a false confession. Kirk himself testified about why he allegedly gave a false confession. Kirk cross-examined both Luberts and Guith regarding the interrogation techniques they employed when interviewing Kirk. Where, as here, the jury has adequate information to consider the circumstances of the defendant's confession, expert testimony is unhelpful to the jury.

Kirk next argues that Dr. Davis' testimony is comparable to expert testimony on battered woman syndrome and on the effects of sexual abuse on child victims, which is generally permitted in Minnesota courts. *See, e.g., State v. Hennum*, 441 N.W.2d 793, 798 (Minn. 1989) (permitting testimony regarding battered woman syndrome because it would "help explain a phenomenon not within the understanding of an ordinary lay person"); *see also State v. Hall*, 406 N.W.2d 503, 505 (Minn. 1987) (permitting testimony regarding behavioral characteristics frequently seen in adolescent victims of sexual abuse). Kirk alleges that Dr. Davis' testimony would explain why an innocent

15

person would confess to a crime, which is "as counterintuitive to the average juror as the common behavior of child abuse victims or domestic abuse victims."

But, the supreme court in *Ritt* said that under the circumstances of that case, the jury had sufficient evidence to determine whether the police interrogation techniques were "coercive enough to make an ordinary innocent person confess." 599 N.W.2d at 812. *Ritt* explicitly distinguished the testimony regarding interrogation techniques from expert testimony regarding battered woman syndrome or the behavior of sexually abused children. 599 N.W.2d at 811. The court noted that testimony regarding battered woman syndrome or the behavior of sexually abused children, unlike testimony regarding interrogation techniques, explained a "behavioral phenomenon not within the understanding of an ordinary lay jury." *Id.* As in *Ritt*, the expert testimony offered in this case is within the understanding of a lay jury. The jury had ample evidence to determine whether Kirk had been coerced into making a false confession, including a recording of the interview, testimony regarding the interview techniques, and Kirk's own explanation of his allegedly false confession. Kirk's argument is without merit.

Finally, Kirk contends that the American court system is more aware of false confessions and that, therefore, the caselaw regarding the admissibility of expert evidence should be reevaluated. In support of his contention, Kirk cites *Corley v. United States*, 556 U.S. 303, 320–21, 129 S. Ct. 1558, 1570 (2009), in which the United States Supreme Court noted its concerns with the pressures of custodial interrogation inducing people to confess to crimes that they never committed. But *Corley* did not address the issue of

16

whether expert testimony regarding false confessions was admissible and Kirk cites no Minnesota case that holds that such testimony is admissible.

Based upon the circumstances in this case and our standard of review, we conclude that the district court did not abuse its discretion in excluding the proposed expert testimony regarding false confessions.

**Affirmed.**