STATE OF MINNESOTA

IN SUPREME COURT

A15-1821

Le Sueur County                                                                    Chutich, J.

State of Minnesota,

                    Respondent,

vs.                                                                    Filed:  October 19, 2016
                                                                      Office of Appellate Courts
Jonas David Nelson,

                    Appellant.

_____

Lori Swanson, Attorney General, Edwin W. Stockmeyer, Assistant Attorney General, Saint Paul, Minnesota; and

Brent Christian, Le Sueur County Attorney, Le Center, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Steven P. Russett, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.
_____


S Y L L A B U S

1.      The district court did not err when it denied appellant's motion to suppress his confessions because the totality of the circumstances shows that appellant voluntarily confessed.

2.      Appellant forfeited his Eighth Amendment challenge to his sentence when he failed to raise the claim in the district court.

3.      The order attached to the Warrant of Commitment erroneously lists two convictions for lesser-included offenses, which are vacated.

Affirmed as modified.

O P I N I O N

CHUTICH, Justice.

A Le Sueur County jury found appellant Jonas David Nelson, then 18 years old, guilty of first-degree premeditated murder, second-degree intentional murder, and second-degree felony murder for the January 6, 2014, killing of his father, Richard Nelson. The district court sentenced Nelson to life in prison without the possibility of release for the offense of first-degree premeditated murder.

On direct appeal, Nelson contends that the district court erred when it denied his motion to suppress his confessions. He also argues, for the first time, that he was psychologically and socially a juvenile when he committed the crime and therefore his mandatory sentence of life in prison without the possibility of release violates the United States Constitution's Eighth Amendment prohibition on cruel and unusual punishment. Finally, he asserts that the order attached to the Warrant of Commitment erroneously lists convictions for the lesser-included offenses of second-degree intentional murder and second-degree felony murder.

Because we conclude that Nelson's confessions were voluntary and that he forfeited his Eighth Amendment claim when he failed to raise it before the district court, we affirm his conviction and sentence for first-degree premeditated murder. Because the order

attached to the Warrant of Commitment incorrectly lists convictions for the two lesser-included offenses, we vacate those two convictions.

## I.

Jonas Nelson and his father lived in a house in rural Montgomery. Nelson called 911 at 11:00 p.m. on January 6, 2014. He told the operator that he wanted to "report a murder" and that his father had been "shot through the head." It was a frigid night, and the 911 operator instructed Nelson to wait in his father's truck to stay warm until officers arrived. He did so.

Deputy Todd Lau arrived about 10 minutes later. He surveyed the scene and found Nelson's father dead on the living room floor from a gunshot wound to the head. Lau then asked Nelson to tell him what happened. Nelson told Lau that he had been upstairs watching a movie when he heard glass breaking and a "pop." He said that he came downstairs and found his father dead on the living room floor, and that he thought someone had shot him from outside the house.

Deputy Scott O'Brien arrived a few minutes after Lau. O'Brien asked Nelson if he wanted to contact any family members, and Nelson said no. O'Brien asked Nelson if he would move to his squad car, which was warmer, and then the two of them briefly conversed. Nelson told O'Brien the same version of events that he had told Lau. When Nelson requested to go to his grandparents' house, O'Brien said that they would "make

arrangements" after Nelson spoke to an investigator. O'Brien also informed Nelson that he could contact his mother if he wished.[1]

Around 12:15 a.m., Le Sueur County Sheriff's Investigator Bruce Collins asked Nelson to come sit in his unmarked squad car and talk. Their 25-minute conversation was recorded. Collins asked Nelson if he was okay, and Nelson responded that he was "cold" and "getting used to the idea that [his father was] not around anymore." Nelson again repeated the same story that he told Lau and O'Brien. He also told Collins that his father had been acting like a "probation officer" and holding a "grudge" against him. Nelson told Collins that he and his father had argued earlier that day about maintaining the fire in the wood stove that heated the house. At the end of the conversation, Nelson again mentioned going to his grandparents' house. Collins told Nelson that they needed him to be patient so they could "understand what happened here tonight." After this conversation, Collins called Special Agent Mike Anderson from the Minnesota Bureau of Criminal Apprehension and asked him to come to the scene.

From around 12:40 a.m. until 2:39 a.m., Nelson waited in his father's truck with O'Brien. At one point, Nelson told O'Brien that he felt "really woozy" and asked if he could urinate outside. O'Brien said no and explained to Nelson that it might contaminate the crime scene.

By this time, the officers had identified inconsistencies between the physical evidence and Nelson's description of the events. Consistent with Nelson's speculation that

---

[1] Nelson, whose parents were divorced, began living with his father in August 2013. Before then, Nelson had lived with his mother and her parents in Prior Lake.

4

someone had shot his father from outside, glass was broken in the bottom pane of the French doors in the living room. But brain matter and skull fragments lay *between* the French doors and the body, showing that the bullet had not entered through the French doors. Further, O'Brien found no footprints in the snow outside the house.

Around 2:39 a.m., Collins brought Nelson to his unmarked car and introduced him to Special Agent Anderson. They told Nelson that the conversation would be recorded and gave him a *Miranda* warning. After the *Miranda* warning, Nelson asked whether he would have the right to refuse to answer a question, and the officers responded that he would. Nelson waived his *Miranda* rights, and then repeated the account of events that he had previously shared with Lau, O' Brien, and Collins.

After Nelson spoke about his family situation, Anderson expressed sympathy, saying, "[O]bviously you're in kind of a crappy situation here." Anderson then described the forensic analysis that law enforcement would conduct at the scene, including testing for blood spatter on Nelson's clothes and gunshot residue on his hands.

Anderson continued:

I think both of us are gettin' a picture of life wasn't pleasant here . . . and . . . you're not in a good situation okay and we can understand that and other people will understand that okay but . . . if something happened between you and your dad . . . tonight more than what you're telling us the most important thing is that now is the time okay to tell us and . . . be honest about that.

Anderson said that "later it would be too late," and that "[p]eople respect honesty."

Collins added, "now is the time to say . . . we can help deal with that we can't later on." Collins further stated, "we're not gonna disrespect you . . . you'll never be happy until you get that off your chest Jonas."

5

Shortly after these statements were made, Nelson said, "I do fully and completely understand the consequences that do come up," and he confessed to using his father's rifle to shoot his father in the head while he was sleeping on the living room floor. Nelson told the officers that he then shot a bullet through the French doors, returned the gun, and placed the shell casings in a bucket in the basement. As the interview concluded, Anderson asked Nelson whether he made the statement of his own free will and without coercion or promises. Nelson said yes. Officers allowed Nelson to urinate outside before taking him to the Le Sueur County Jail around 4:15 a.m.

Nelson confessed two more times after his arrest. Anderson and Collins questioned Nelson at the jail on the afternoon of January 7, and Anderson returned to question Nelson the following day. The officers recorded all three of Nelson's confessions.

Nelson moved to suppress the confessions. He called an expert, Dr. Harlan Gilbertson, a licensed psychologist, who opined that Nelson's restrictive childhood conditioned him to acquiesce to male authority figures. Dr. Gilbertson testified that Nelson was "quite socially delayed" and had an IQ in the low to average range. He further testified that he believed Nelson's statement was not voluntary because he was fatigued from staying at the scene for several hours, moving from car to car, and answering questions from different law enforcement officers.

The State also called a licensed psychologist, Dr. Katheryn Cranbrook, who opined that Nelson's statement was voluntary. She disagreed with Dr. Gilbertson that Nelson acquiesced to male authority figures and provided several counterexamples. The district court denied Nelson's motion to suppress the confessions.

6

After a trial, the jury found Nelson guilty of first-degree premeditated murder, second-degree intentional murder, and second-degree felony murder. As required by Minnesota's heinous crimes statute, the district court sentenced Nelson to life in prison without the possibility of release. *See* Minn. Stat. § 609.106, subd. 2(1) (2014). The order attached to the Warrant of Commitment listed convictions for first-degree premeditated murder, second-degree intentional murder, and second-degree felony murder.

## II.

Nelson contends that his confessions were not voluntary and therefore the district court erred when it denied his motion to suppress them. He asserts, in particular, that his on-scene confession was involuntary because the interrogating officers led him to believe that they were not his adversaries and that confessing would benefit him. He also asserts that his youth, inexperience, and upbringing made him "particularly susceptible" to the officers' manipulative interrogation techniques, in part because childhood abuse had conditioned him to acquiesce to male authority figures. After carefully considering these arguments, the officers' conduct, and the totality of the circumstances, we conclude that Nelson's confessions were voluntary.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits the admission into evidence of a confession that was not voluntarily given. *Dickerson v. United States*, 530 U.S. 428, 433 (2000). The State bears the burden to prove the voluntariness of a confession by a preponderance of the evidence. *State v. Zabawa*, 787 N.W.2d 177, 182 (Minn. 2010). We review de novo the district court's legal

7

determination that the defendant's confession was voluntary. *Id.* We accept the district court's findings of fact unless they are clearly erroneous. *Id.*

The central question in determining whether a confession is voluntary is whether the defendant's "will was overborne at the time he confessed." *State v. Farnsworth*, 738 N.W.2d 364, 373 (Minn. 2007) (quoting *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)). This determination depends on the totality of the circumstances, *id.*, but some coercive state action is required to make a confession involuntary, *Colorado v. Connelly*, 479 U.S. 157, 163-65 (1986). We determine whether the actions of law enforcement officers, together with the circumstances surrounding the confession, "were so coercive, so manipulative, so overpowering that [the defendant] was deprived of his ability to make an unconstrained and wholly autonomous decision to speak." *State v. Pilcher*, 472 N.W.2d 327, 333 (Minn. 1991).

Coercion does not necessarily involve physical violence or threats; "[p]romises, trickery . . . and stress-inducing techniques" can also overcome a defendant's will. *Id.* Other relevant circumstances include "the defendant's age, maturity, intelligence, education, experience, and ability to comprehend," along with "the nature of the interview, including its length, the lack of or adequacy of warnings, whether the defendant's physical needs were met or ignored, and whether the defendant was denied access to friends." *Zabawa*, 787 N.W.2d at 182-83.

"That the interrogating officers chose a sympathetic approach does not, in itself, render [the defendant's] statements involuntary." *Pilcher*, 472 N.W.2d at 333. In *Zabawa*, for example, the defendant argued that his confession was not voluntary because the police

8

investigators had posed as his friends during the interrogation and "seemingly rotate[d] compliments" with allegations that Zabawa was lying. 787 N.W.2d at 184. We concluded that the statements were admissible, noting that Zabawa displayed "wariness" toward investigators and "did not admit to anything unless he was confronted with facts that refuted his story." *Id.* Similarly, we held in *Pilcher* that the confession was admissible because Pilcher was wary of interrogators and appeared aware of their adversarial role. 472 N.W.2d at 334.

Promises of special treatment can make a confession involuntary. *See State v. Biron*, 266 Minn. 272, 283, 123 N.W.2d 392, 399 (1963) (concluding that a confession was inadmissible when an officer implied that the defendant would be tried as a juvenile only if he confessed). In *State v. Clark*, the interrogating officer encouraged the defendant to confess using a motivational style, saying, "from this day forward your future's spotless. You can never f*** up again if you don't want to." 738 N.W.2d 316, 333 (Minn. 2007). The officer also suggested that the defendant "didn't plan this" and that "[t]here might be a break in this. They might not give you life without parole." *Id.* at 334. We explained that these statements were "appeals to Clark's conscience and personal integrity" rather than inducements, and concluded that the defendant did not consider them to be promises. *Id.* at 335. We therefore held that Clark's confession was voluntary.

Applying these principles here, we conclude that the tactics that Collins and Anderson used to encourage Nelson to confess were not coercive. Their vague statements are different from the objectionable explicit promise of trial as a juvenile made in *Biron*; in fact, the statements closely resemble the encouragement found to be noncoercive in

9

*Clark*. As in *Clark,* the investigators' statements here are best understood as "appeals to . . . conscience and personal integrity," 738 N.W.2d at 335, rather than as improper promises.

Nelson's behavior and statements show that his will was not overborne. Tellingly, and like the defendant in *Zabawa*, he did not confess until he was confronted with the likelihood that the physical evidence would not match his story. Only after the investigators explained the forensic analysis that they would conduct did Nelson abandon his story of an outside shooter. Moreover, like the defendant in *Pilcher*, Nelson showed that he was aware of the officers' adversarial role; he said that he "fully and completely" understood "the consequences" of confessing. And after his first and last confessions, Nelson affirmed that he had not been coerced. *Cf. In re Welfare of M.D.S.*, 345 N.W.2d 723, 732 (Minn. 1984) (finding that a confession was not coerced when the minor testified that she would have cooperated even if alleged promises had not been made). Alhough Nelson asserts that he was conditioned to acquiesce to male authority figures, the State effectively rebuts that argument with several persuasive counterexamples, including Nelson's argument with his father regarding the woodstove.

Nelson also asserts that his on-scene confession was involuntary because he was fatigued from staying at the scene for several hours in the cold, moving from car to car, and answering questions from several different law enforcement officers. He emphasizes that he was not allowed to urinate when he asked to do so and was told that he could not go to his grandparents' house until he had spoken to investigators.

10

Prolonged physical discomfort and isolation from friends and family can make a confession involuntary. *See Connelly*, 479 U.S. at 163 n.1 (collecting cases). For example, in *Greenwald v. Wisconsin*, the Supreme Court held that the defendant's confession was involuntary because he was interrogated for over 18 hours without an opportunity for food or sleep. 390 U.S. 519, 521 (1968). By contrast, the Supreme Court held in *Ashdown v. Utah* that the defendant's confession was voluntary after she was questioned for over five hours, in an empty courtroom, by several law enforcement officials with whom she was familiar. 357 U.S. 426, 427-28 (1958). In *State v. Riley*, the police apprehended the defendant using tear gas. 568 N.W.2d 518, 522 (Minn. 1997). After paramedics treated him, police interrogated the defendant for two hours. *Id.* at 525. We held that a "two-hour interview, in and by itself, is not coercive," and that Riley's statement was voluntary. *Id.*

The district court found that, "although Nelson waited in several vehicles while the investigation was ongoing and spoke with several different individuals, he was not subject to constant interrogation," nor "physically restrained or shackled." Rather, as the district court further found, "he was frequently asked by officers if he needed anything and if he was warm, and he was provided with the time and opportunity to contact family members, if he desired." Nelson was told once that he could not relieve himself, and he did not bring it up again on record.[2] Two to three hours later, he was allowed to urinate outside. His

---

[2] Most of the five hours that Nelson spent at the scene are audio-recorded, and on those recordings, he asked to relieve himself only once. He did not repeat his request or tell the officers that he was in any related physical discomfort during that time.

11

answers to questions do not suggest that he was highly fatigued or in physical discomfort sufficient to conclude that his confessions were coerced.

In sum, the totality of the circumstances shows that Nelson's will was not overborne. Because we conclude that the State met its burden to demonstrate that the on-scene confession was voluntary, we need not decide whether Nelson's subsequent confessions were fruit of a poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

III.

Nelson also asserts that, even though he was one week past his 18th birthday when he committed the offense, he was psychologically and socially still a juvenile. Thus, he argues, imposing a mandatory sentence of life in prison without the possibility of release is unconstitutional under the Supreme Court decision in *Miller v. Alabama*. ___ U.S. ___, 132 S. Ct. 2455 (2012). We do not reach this claim because Nelson forfeited it when he failed to raise it in district court.[3] *State v. Frazier*, 649 N.W.2d 828, 839 (Minn. 2002).

IV.

Finally, Nelson argues that the order attached to the Warrant of Commitment erroneously lists convictions for the lesser-included offenses of second-degree intentional murder and second-degree felony murder. Minnesota Statutes § 609.04, subd. 1 (2014), provides that "[u]pon prosecution for a crime, the actor may be convicted of either the crime charged or an included offense, but not both." Although the district court correctly sentenced Nelson only for the first-degree murder offense, the order attached to the

---

[3]     We need not and do not decide whether Nelson may renew his claim in a motion to correct his sentence under Minn. R. Crim. P. 27.03, subd. 9.

Warrant of Commitment lists convictions for three offenses: first-degree premeditated murder, second-degree intentional murder, and second-degree felony murder.  The second-degree murder charges are lesser-included offenses of first-degree murder.  *See State v. Leinweber*, 303 Minn. 414, 421, 228 N.W.2d 120, 125 (1975).  Accordingly, we vacate the convictions for second-degree intentional murder and second-degree felony murder.

Affirmed in part and vacated in part.